[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 23, 2002
THOMAS K. KAHN
CLERK

_____

No. 00-16361
_____

D.C. Docket No. 97-06832 CV-PAS

ROBERT R. ROWE,

Plaintiff-Appellant,

versus

FORT LAUDERDALE, THE CITY OF,
a municipal corporation, BLACKBURN,
individually and as police officer of the
City of Fort Lauderdale, et al.

Defendants-Appellees.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

**(January 23, 2002)**

Before EDMONDSON and CARNES, Circuit Judges, and MUSGRAVE*, Judge.

_____

*Honorable R. Kenton Musgrave, Judge, United States Court of International Trade, sitting by designation.

CARNES, Circuit Judge:

Robert Rowe and Cynthia Doss were married in 1974. The record in this case does not show how long they were happy together, but it does show that their marriage ended in bitterness and rancor that has not faded in the two decades since they were divorced in 1981. The couple had one daughter, and a dispute over custody of the child became the centerpiece of their disagreements during and after the divorce. In the midst of the dispute over child custody, the mother reported that the girl, then age nine, had accused her father of molesting her. The daughter repeated those accusations to the authorities and in testimony at Rowe's trial, and Rowe was convicted and sentenced in 1984 to serve life in prison for the sexual battery of his daughter. However, in 1994, after he had served ten years of his sentence, Rowe succeeded in obtaining an order setting aside his conviction on the grounds of ineffective assistance of counsel.

Having secured his release, Rowe filed in federal district court a lawsuit raising federal and state law claims against some of the people involved in accusing, investigating, and prosecuting him. Five of the defendants Rowe did sue are involved in this appeal. They are: 1) Cynthia Doss, Rowe's ex-wife, who initially reported the alleged abuse to authorities; 2) Sharon Anderson, a state child services worker who investigated Doss's report of abuse; 3) the Florida

2

Department of Health and Rehabilitative Services (HRS),[1] which was Anderson's employer at the time she investigated the daughter's story;  4) Joel Lazarus, the prosecutor who obtained Rowe's indictment and conviction; and 5) Michael Satz, in his official capacity as the State Attorney for Broward County, because he was Lazarus's employer at the time of the prosecution.

Each of these defendants prevailed against Rowe in the district court either on motions to dismiss or motions for summary judgment, and he now appeals the resulting judgments in their favor.  For reasons we will discuss, we are going to affirm the district court's grant of summary judgment on the section 1983 claims against Doss and Lazarus and its dismissal of the claim against Anderson for insufficient service of process.  But we are going to reverse the district court's dismissal of the state law claims against Satz and HRS  and remand those claims to the district court for further proceedings.

## I. BACKGROUND

### A.  PROCEDURAL HISTORY

Rowe's conviction for capital sexual battery was set aside by a state court in

_____

[1]By the time Rowe was released from prison, the Florida Department of Health and Rehabilitative Services had changed its name to the Florida Department of Children and Family Services.  Notwithstanding that, we will refer to the department by its former name or as  "HRS," because that was what it was called at the time it was involved in the investigation of  Rowe.

1994 on the grounds of ineffective assistance of counsel at his trial in 1984.[2]  The local prosecutor attempted to retry Rowe  but his daughter, then in her twenties, was unwilling to testify, and the trial court ruled that her testimony from the first trial could not be used in any retrial of Rowe.  As a result, there was no retrial; the charges against Rowe were dismissed.

Three years after his release, in 1997, Rowe filed this lawsuit in federal district court against  Doss, Anderson, and Lazarus, among others, for their roles in investigating, arresting, and prosecuting him in 1984.  He alleged that they had withheld or destroyed  material evidence, and had fabricated and planted false evidence and used false testimony in order to secure his wrongful conviction.  He further alleged that they had conspired together to achieve their nefarious goal. (Rowe did not sue his daughter, whose allegedly false testimony was an essential part of the conspiracy.)  Rowe brought malicious prosecution and conspiracy claims under 42 U.S.C. § 1983 against Lazarus,  Anderson, and Doss.  He also brought two state law claims, one for negligent loss or destruction of evidence and the other for negligent supervision and training, against both Michael Satz in his

---

[2]Specifically, the state court ruled that the assistant public defender who represented Rowe at trial was ineffective in failing, among other things: 1) to seek the appointment of medical experts; 2) to request medical reports from the girl's pediatrician; 3) to contact witnesses who could have contradicted the girl's story; 4) to properly present and preserve a motion for a continuance which would have given him time to do the preceding three things; and 5) to raise or preserve various evidentiary objections at trial.

4

official capacity as the State Attorney for Broward County (Lazarus's employer), and the Florida Department of Health and Rehabilitative Services (Anderson's employer).[3]

All of the defendants filed motions to dismiss. The district court did dismiss the state law claims against Satz and HRS, finding that Rowe had not timely filed the notice required under Florida law to invoke the state's statutory waiver of sovereign immunity. The district court denied Lazarus's and Doss's motions to dismiss.[4] As for Anderson, the district court ruled that she had not been properly served, quashed the attempted service on her, and gave Rowe 30 days in which to effect proper service. Rowe then unsuccessfully attempted to serve Anderson via letters rogatory in Australia, where he believed she was residing. After that effort failed, Rowe attempted substituted service by serving the Florida Secretary of State

---

[3]In this same lawsuit, Rowe brought similar claims against the City of Fort Lauderdale and certain individually named Fort Lauderdale police officers. Those claims were dismissed by the district court, see Rowe v. City of Fort Lauderdale, 8 F. Supp. 2d 1369 (S.D. Fla. 1998), and those defendants are not involved in this appeal. Rowe also sued the Broward County public defender in a separate section 1983 lawsuit, alleging that the failure to allot adequate resources to assistant public defenders had hampered the representation Rowe received from the assistant public defender who represented him in his criminal trial. The public defender was granted summary judgment on immunity grounds, and we affirmed. See Rowe v. Schreiber, 139 F.3d 1381 (11th Cir. 1998).

[4]The district court initially granted Doss's motion to dismiss the conspiracy claims, because Rowe failed to allege the necessary element of agreement between the conspirators. However, Rowe then amended his complaint to properly allege the elements of conspiracy, and the district court denied Doss's motion to dismiss the amended complaint.

5

and mailing a certified copy of the Second Amended Complaint to Anderson at the Australian address that had been provided by her trial counsel. Anderson filed a motion to dismiss, asserting that she had not been properly served. The district court agreed, quashed the substituted service on Anderson, and dismissed Rowe's claims against her.

Lazarus and Doss then each filed summary judgment motions. The district court granted Doss's motion in August 1999, and granted Lazarus's motion in August 2000. Sandra Ledegang, a police detective who was by this point the last defendant left in the case, settled with Rowe, and the court entered final judgment dismissing the case with prejudice. Rowe now appeals the summary judgments granted to Lazarus and Doss, and the dismissals granted to Satz, HRS, and Anderson.

## B. ROWE'S THEORY

Before getting into Rowe's specific claims and theories of liability as to each remaining defendant, we think it helpful to set out his overall theory of how he came to be convicted and spend ten years in prison for a crime he insists he never committed. Once we have done that, we can turn to a more specific examination of the actual evidence and law applicable to the claims against each of the remaining defendants. We stress that what we set out here is not proven fact, and some of it

6

is not even supported by any reasonable view of the evidence, but instead is Rowe's best case – or perhaps "worst case" would be a better term – scenario.

Rowe believes that he was the victim of a conspiracy whose goal was to wrongfully convict him of sexually abusing his daughter. His wife coaxed his daughter into fabricating tales of abuse at the hands of her father, and the conspiracy began in earnest after Doss called the Florida Department of Health and Rehabilitative Services to report the allegations. From that point, various state officials joined with Doss to see that Rowe was unlawfully convicted.

Rowe believes that Sharon Anderson, an HRS case worker, joined the conspiracy. Although Anderson did not take Doss's initial call to HRS, she was on duty the day after the call came in, and thus became the main HRS worker on the Rowe case. She would later prepare and back-date a HRS "intake report" to replace the one actually taken when Doss first called HRS. The replacement report made it look as though Anderson had taken the initial call, and more importantly omitted important information about what the girl had said over the phone–information that had been included in the initial, genuine intake report. On the day after the initial phone report, Anderson visited Doss's apartment and spoke with Rowe's daughter. She then brought the girl down to the police station where a police officer, Sandra Ledegang, took the girl's recorded statement. Anderson

would later give inconsistent testimony as to whether or not she was in the room with Ledegang when the girl gave her statement.

Rowe believes that if Anderson was present, then she would have had reason to know about the next step in the conspiracy.[5] The next step in the conspiracy, according to Rowe, is that Ledegang deliberately transcribed the audiotape of the girl's statement inaccurately in order to purge it of inconsistencies, bolster the girl's credibility, and clear away indications that Ledegang had coaxed the girl into giving the desired answers. Doss, too, was apprised of this planned fabrication because, after Ledegang had taken her daughter's statement, Ledegang confided in her that the girl's statement was inconsistent, or unpersuasive, but that Ledegang was planning to "fix" the problems when she did the transcription. Ledegang then concealed the inaccuracies in the transcription with her repeated false claim in deposition and at trial that she had, pursuant to police procedure, destroyed the original audiotapes of the girl's statement.

Rowe believes, however, that the tapes of his daughter's statement had not been destroyed, but were instead in the possession, or at least in the control of the prosecutor, Lazarus. Lazarus not only had the tapes, but he let the trial judge

---

[5]This is as good a place as any to trim the case down by one defendant. After a thorough review of the record and full consideration of Rowe's arguments, we affirm without discussion the district court's dismissal of the claim against Anderson on grounds that she was not properly served. See 11th Cir. R. 36-1.

8

listen to them.  Yet the tapes, which would have shown that the transcript was a forgery, and that the daughter's original answers were inconsistent, incredible, and insincere (because coaxed from her by Ledegang), were never turned over to Rowe.

Rowe believes that concealing the tapes was only part of Lazarus's role in the frame-up.  Lazarus also attended the search of Rowe's apartment that immediately followed the taking of the recorded statement, and thus was present when police switched the girl's short jump rope with a longer, knotted one to better corroborate the girl's story that her father tied her up with her jump rope when he abused her.  Later, at trial, Lazarus introduced the phony long, knotted rope into evidence, even though he had seen the police discover the original short, unknotted one.  Lazarus also knew that the police had found in Rowe's apartment various items that would have helped him prove he had a good relationship with his daughter, but Lazarus did nothing when those items were removed from the apartment (most likely by Ledegang) and then withheld from Rowe.   Knowing about the suppressed tapes, the phony rope, and the withheld evidence, and having reason to know (from the discrepancies between the  tape and transcript) that the daughter's story was untrue, Lazarus nonetheless sought and procured the indictment of Rowe on three counts of capital sexual battery.   At trial Lazarus put

9

on Doss, Anderson, and Ledegang as witnesses, all of whom perjured themselves, and introduced the fabricated evidence (the rope and photo) to prove the case.

Thus, Rowe believes it was through the concerted and bad-hearted efforts of Doss, Anderson, Ledegang, and Lazarus that he was convicted and sentenced to life in prison. According to Rowe, that is the real story behind his conviction.

We turn now to the specific legal claims against each of the remaining defendants to see what the evidence, viewed in the light most favorable to Rowe, shows, and the result produced when the law is applied to that evidence. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996).

## II.  DISCUSSION

A. DEFENDANT LAZARUS'S SUMMARY JUDGMENT MOTION

Rowe brought two section 1983 malicious prosecution claims against Lazarus:  a substantive claim based upon Lazarus's own actions, and a conspiracy claim based upon his concerted actions with others –  Anderson, Ledegang, and Doss.  Viewed in the light most favorable to Rowe, and drawing all inferences in his favor, the evidence shows the following facts regarding these claims against Lazarus.

Lazarus was present when the police searched Rowe's apartment.  Rowe, who was also present in the apartment at the time,  personally saw Lazarus actively

10

participate in the search. Lazarus logged in evidence as it was found. During the search the police were looking for, among other things, a jump rope which Rowe's daughter claimed he had used to tie her up during the sexual abuse. The police did find a jump rope in Rowe's apartment. The Return and Inventory attached to the search warrant after the search indicates that the jump rope was found in the living room, and Ledegang testified to the grand jury that the jump rope had been found "over a sofa" in the living room, but that she was not the one who found it. At trial, however, Ledegang testified that the jump rope had been found in the girl's bedroom, and Lazarus produced a photo of the jump rope in the bedroom to support that testimony.

Rowe saw Ledegang find the jump rope in the girl's bedroom and take it to another bedroom, where Lazarus was located.[6] Rowe saw no photographs being taken of the jump rope taken before Ledegang moved it, and therefore the photograph of the rope in the girl's bedroom, that was introduced at trial and which

---

[6]Citing a passage from Lazarus's testimony in Rowe's post-conviction proceedings ten years after the search, Rowe alternatively contends that Lazarus was the one who actually found the rope. Rowe's interpretation of that testimony strains credulity and flatly contradicts Rowe's own testimony that he personally saw Ledegang find the rope. Even in the summary judgment context, we are not required to accept any interpretation of testimony by the non-movant, no matter how strained. Instead, we need only accept every reasonable interpretation that the non-movant puts forward. Having carefully examined that testimony in its context, we reject Rowe's interpretation of it as unreasonable and accept his own testimony that Ledegang is the one who found the rope.

11

Lazarus and Ledegang represented to be a photo of the rope lying where it was first found, must have been an after-the-fact fabrication. In addition, the actual rope that Lazarus introduced into evidence at trial was not his daughter's rope. The daughter's rope was short, dirty, and frayed, and it had no knots in it. The rope introduced at trial, on the other hand, was 96 inches long, "almost brand new," and had loops in it which neatly corroborated the daughter's testimony that Rowe had used the rope to tie her up.

The rope was not the only item of evidence the police were searching for. The search warrant also listed a polaroid camera which the girl claimed Rowe had used to take nude photographs of her, nude polaroid photographs of the girl and other neighborhood children, old clothes of Doss's which the girl said Rowe had made her wear while he abused her, and sexually explicit videos. They found the camera, the clothes, and the videos, but not the nude pictures the girl had described.

Exculpatory evidence was present in Rowe's apartment prior to his arrest, it was gone after the arrest, and it was never provided to defense counsel. That evidence included Rowe's personal record of the problems Doss had been causing in his visitation schedule, an audiotape of Rowe playing with his daughter, and cards and notes sent by his daughter to Rowe. The visitation record would have

12

shown the acrimony between him and Doss over visitation, and it would have impeached his daughter's testimony by showing she was only with him on Father's Day itself and not for the entire Father's Day weekend as she had claimed in her recorded statement and in her testimony. The tape, cards, and notes would have been relevant to show that Rowe and his daughter had a loving relationship, and not an abusive one. Ledegang had the keys to Rowe's apartment in connection with the search and at the time the evidence disappeared. As we have mentioned, Lazarus was present during the search and helped log in the evidence as it was found. The exculpatory evidence was never logged into evidence or made available to Rowe's lawyer.[7]

In addition to his role in the search, Lazarus, after becoming the prosecutor in the case, had the actual audiotapes of the daughter's statement. Ledegang, who took the girl's statement and had it transcribed, testified at the trial that she had erased the tapes immediately after transcribing them. At the preliminary hearing, however, Lazarus admitted in the presence of Rowe and his counsel that he had the tapes in his files.[8] Not only that, but during later pretrial proceedings, the

_____

[7]This evidence, if it did once exist, has never resurfaced.

[8]When the lawyers were discussing discovery, Rowe sought to gain access to audiotapes he had made of him playing with his daughter, which he claimed had been in his apartment at the time of the search. Lazarus denied that any tapes of Rowe and his daughter from the apartment were in his file, saying: "The only tapes I've indicated as far as outside the video cassettes would

judge said: "Somebody asked, 'Did you hear the sounds on the tape recording'– and that detective that asked her the questions first –boy. Oh, boy. Oh, boy. I never saw anything so leading in my life. Terrible." From that Rowe asks us to infer – and difficult as it is we will infer; it does not matter to the result anyway– that the trial judge himself had heard the audio tapes.

To summarize, viewed most favorably to Rowe, the evidence shows that Lazarus had, or had access to, the audio tapes of the girl's recorded statement, but did not give those tapes to Rowe's attorney (although Lazarus did inform him of their existence). He either found, or witnessed the finding of, the real jump rope, and witnessed the finding of other pieces of exculpatory evidence, which were never logged into evidence and which were never made available to Rowe's defense attorney. At Rowe's trial, Lazarus introduced a fabricated photograph indicating the jump rope had been found in the girl's bedroom when he knew it had not, and knowingly introduced a fake jump rope that was longer than the real rope and had been knotted to corroborate the girl's story. In addition, Lazarus put on testimony by Doss, her daughter, Anderson, and Ledegang, even though he either knew (as to Ledegang) or had reason to know (as to Anderson, Doss, and her

---

be the cassettes of the mother and child on the original statement." (Doss had, like her daughter, given a recorded statement to the police on the day Anderson took the child to the police station.)

14

daughter) they were lying.[9]

We now turn to the issue of whether, given those facts, the district court was right to grant Lazarus summary judgment on Rowe's claims against him. We begin by discussing whether Lazarus was entitled to immunity from Rowe's claims. A prosecutor is entitled to absolute immunity for all actions he takes while performing his function as an advocate for the government. Buckley v. Fitzsimmons, 509 U.S. 259, 273, 113 S. Ct.. 2606, 2615-16 (1993). The prosecutorial function includes the initiation and pursuit of criminal prosecution, Imbler v. Pachtman, 424 U.S. 409, 424, 96 S. Ct.. 984, 992 (1976), and all appearances before the court, including examining witnesses and presenting evidence. See Burns v. Reed, 500 U.S. 478, 492 111 S. Ct.. 1934, 1942 (1991). Under these principles, it is clear that, even if Lazarus knowingly proffered perjured testimony and fabricated exhibits at trial, he is entitled to absolute immunity from liability for doing so.

To the extent he stepped out of his prosecutorial role to perform "the

---

[9]We realize that Lazarus disputes this version of the facts, but, on summary judgment, we are bound to accept Rowe's version of any disputed facts, and draw all reasonable inferences from those facts in his favor. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996). Thus, for example, while we doubt that Lazarus's and the trial judge's statements really prove that Lazarus had the tapes of the girl's statement and allowed the judge to listen to them (which, if they really were so damning, would have been unwise, unless the judge, too, was in on the conspiracy), in reviewing the summary judgment granted Lazarus, we assume that this allegation is true.

investigative functions normally performed by a detective or police officer," however, Lazarus does not have absolute immunity. See Buckley, 509 U.S. at 273, 113 S. Ct.. at 2616; see also Burns, 500 U.S. at 496, 111 S. Ct.. at 1944-45 (no absolute immunity for a prosecutor who gives legal advice to police during pretrial investigation); Jones v. Cannon, 174 F.3d 1271, 1285 (11th Cir. 1999) (prosecutor is only entitled to immunity for his conduct during the "judicial phase" of a case). Thus, for example, Lazarus does not have absolute immunity for his participation in the search of Rowe's apartment. He does, however, have qualified immunity for his investigatory actions.

Qualified immunity shields government officials who perform discretionary governmental functions from civil liability so long as their conduct does not violate any "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct.. 2727, 2738 (1982); Lassiter v. Ala. A&M Univ., 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc). Under this rule, a government agent is entitled to immunity unless his act is "so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." Lassiter, 28 F.3d at 1149. When case law is necessary to

16

clearly establish the right,[10] only a decision of the United States Supreme Court,

this Court, or the highest court of the state in which the case arose will suffice to

establish it. Marsh v. Butler County, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en

banc). Further, even a decision from one of those courts will only clearly establish

a right when the official's actions supposed to have violated that right were taken

in a factual situation "materially similar" to the factual situation in the decision. Id.

at 1032. "For qualified immunity to be surrendered, pre-existing law must dictate,

that is, truly compel (not just suggest or allow or raise a question about), the

conclusion for every like-situated, reasonable government agent that what

defendant is doing violates federal law in the circumstances." Lassiter, 28 F.3d at

1150.

---

[10]Case law is not always necessary to clearly establish a right. A right may be so clear from the text of the Constitution or federal statute that no prior decision is necessary to give clear notice of it to an official. See Lassiter, 28 F.3d at 1150 n.4. Also, a general constitutional rule set out in preexisting case law may apply with obvious clarity to the specific circumstances facing the official. See United States v. Lanier, 520 U.S. 259, 117 S.Ct. 1219 (1997). The official's conduct may be so egregious that an objective and reasonable official must have known it was unconstitutional even without any fact-specific caselaw on point. See Marsh v. Butler County, 268 F.3d 1014, 1031 n.9 (11th Cir. 2001) (en banc). Such exceptions are rare, however. The general rule is that "[g]eneral propositions have little to do with the concept of qualified immunity. If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." Lassiter, 28 F.3d at1150 (citations and quotations omitted). This case, where Rowe is alleging that Lazarus's actions constituted "malicious prosecution," falls squarely within the general rule. Rowe can only prove that Lazarus's actions violated Rowe's clearly established rights by pointing us to case law that was extant at the time of Lazarus's acts, which concluded that conduct "materially similar" to Lazarus's violated a federal right.

When a prosecutor steps out of the role of advocate and into the role of investigator, for example by participating in a search, he is performing a discretionary governmental function, and thus may be entitled to qualified immunity. Mullinax v. McElhenney, 817 F.2d 711, 715 (11th Cir. 1987). As has been noted, by attending and allegedly participating in the search of Rowe's apartment, Lazarus stepped out of his advocate's role, and lost the protection of absolute immunity. But, by assuming the role of an investigator, he took on a qualified immunity that protected all of his actions in performing that role that did not violate clearly established rights of which a reasonable person in his position would have known.

An investigator's planting or fabricating evidence in an effort to obtain a conviction does violate clearly established law, Jones, 174 F.3d at 1289-90; Riley v. City of Montgomery, 104 F.3d 1247, 1253 (11th Cir. 1997), and therefore is not protected by qualified immunity. Thus, if Lazarus had engaged in any planting or fabricating of evidence while he was in an investigatory role, he would not be immune from liability for damages to Rowe.

However, Rowe did not produce any summary judgment evidence showing that Lazarus planted or fabricated evidence. With respect to the apartment search, the most the evidence shows is that Lazarus participated in the search himself, and

18

knew what was found in the apartment and what was not found in it. That does not mean that Lazarus personally fabricated or tampered with any evidence. For example, the fact that Rowe saw Ledegang take the jump rope to the back of the apartment, where Lazarus was located, does not allow a reasonable inference that Ledegang gave the rope to Lazarus, much less that Lazarus thereafter personally tampered with the rope. As for investigatory conduct besides the search, according to Rowe it was Anderson who fabricated the HRS Intake Report, and Ledegang who deliberately mis-transcribed the recorded statement. Rowe has shown us no evidence that Lazarus was even aware of these fabrications (if they occurred) at any time before he took off his investigative hat and put on his prosecutorial one. Rowe certainly has not shown us any evidence that, while in an investigator's role, Lazarus personally participated in those fabrications, if they occurred.

The most Lazarus did while acting in an investigative role, when he was protected only by qualified immunity, was to be aware that others were tampering with evidence and take no action to stop them. Rowe does not cite any decisions, and we are not aware of any, clearly establishing that a prosecutor's mere awareness of (as opposed to participation in) evidence fabrication or tampering violates the federal rights of a criminal defendant. To the contrary, in an analogous context, this Court has held that a police officer did <u>not</u> violate clearly established

19

law merely by failing to act in the face of knowledge that another officer had fabricated a confession. Jones, 174 F.3d at 1286. Therefore, Lazarus is entitled to qualified immunity for the actions he personally took or failed to take while in the investigator's role.

It was only while he was in the prosecutor's role that Lazarus allegedly did anything that violated Rowe's clearly established rights, such as: charging Rowe without probable cause, withholding the tapes of the girl's statement, and proffering fabricated evidence such as the rope and perjured testimony. For those actions taken while in the prosecutor's role, however, Lazarus is entitled to absolute immunity from liability.

Therefore, for everything Lazarus did in relation to the investigation and prosecution of Rowe, he is protected by either absolute or qualified immunity. Because Rowe failed to raise a genuine issue of material fact that Lazarus was not immune from liability for his own actions, the district court correctly granted Lazarus summary judgment on the substantive malicious prosecution claim.

There remains the claim against Lazarus based upon the allegations that he conspired with others to maliciously prosecute Rowe. Lazarus can only be liable for conspiring to violate Rowe's rights if his agreement to join the conspiracy or conduct knowingly done in furtherance of it occurred while he was not in his

20

prosecutorial role. Lazarus cannot not be held liable for conspiring to violate Rowe's rights by prosecuting him, because he is absolutely immune from liability for prosecuting Rowe, and, logically, "a person may not be prosecuted for conspiring to commit an act that he may perform with impunity." Jones, 174 F.3d at 1289 (quotation omitted).

The question, then, is whether there is sufficient evidence to show that, at some time before he put on his prosecutor's hat, such as the time he was participating in the search, Lazarus was part of a conspiracy to deprive Rowe of his rights. If we could consider Lazarus's alleged conduct after indictment and at trial, such as presenting evidence which he knew to be fabricated and putting on witnesses he knew would commit perjury, there might be enough evidence to allow a reasonable jury to infer that Lazarus was a member of a conspiracy to wrongfully convict Rowe even as early as the time he participated in the search. For example, if a jury could consider Lazarus's presence when the rope was found in light of his (again, allegedly) introducing another rope at the trial, the jury might reasonably infer that Lazarus actively agreed to or suggested the rope switch at the time of the search, before Rowe's prosecution began.

However, Lazarus's conduct at trial may not be considered as evidence of his participation in a conspiracy. We have previously concluded that a witness's

21

absolute immunity from liability for testifying forecloses any use of that testimony as evidence of the witness's membership in a conspiracy prior to his taking the stand. Mastroianni v. Bowers, 173 F.3d 1363, 1367 (11th Cir. 1999). The reasons for this rule are straightforward. Allowing the use of absolutely immune false testimony as evidence of conspiratorial conduct that is not immune would weaken the shield of immunity that protects witnesses from liability, a shield essential to the presentation of testimony. If getting on the stand to testify exposed a witness to liability, the absolute immunity extended to a witness would be illusory, and that is true even if the exposure was limited to liability for a conspiracy proven through use of the testimony. Thus a witness must be immune from having her testimony used to show a conspiracy.

These same reasons apply with equal force to prosecutorial immunity. It would be cold comfort for a prosecutor to know that he is absolutely immune from direct liability for actions taken as prosecutor, if those same actions could be used to prove him liable on a conspiracy theory involving conduct for which he was not immune. "[T]he vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system" would be unduly chilled. Imbler v. Pachtman, 424 U.S. 409, 427-28, 96 S. Ct.. 984, 993-94 (1976). That is why acts for which a prosecutor enjoys absolute immunity may not be

considered as evidence of the prosecutor's membership in a conspiracy for which the prosecutor does not have immunity.

It follows that we may not consider evidence of Lazarus's alleged misconduct in the prosecution of Rowe in determining whether there is sufficient evidence that he conspired to maliciously prosecute Rowe. Absent evidence of Lazarus's conduct while in the prosecutor's role, there is no genuine issue of material fact supporting the claim that Lazarus participated in a conspiracy against Rowe. So, the district court correctly granted summary judgment to Lazarus on that conspiracy claim, as well as the substantive claim of malicious prosecution.

## B. DEFENDANT DOSS'S SUMMARY JUDGMENT MOTION

Rowe sued Doss under section 1983 both for malicious prosecution and conspiracy to maliciously prosecute. Viewed in the light most favorable to Rowe, and drawing all inferences in his favor, the evidence shows the following facts to support these claims.

During and after their divorce, Rowe and Doss waged an acrimonious battle over the custody of their daughter, which included numerous court appearances and at least one occasion when police were called to Doss's residence to sort out a visitation dispute. The visitation problems intensified throughout 1984, as Doss

23

consistently interfered with Rowe's scheduled visitation with his daughter. On July 3, 1984, after Doss had been reading to her daughter from a magazine article about child abuse, the girl told Doss that Rowe had been sexually and physically abusing her at times up to and including the recent Father's Day weekend. Doss then called the Florida Department of Health and Rehabilitative Services child abuse hotline to report her daughter's accusations of abuse.

Responding to Doss's hotline call, the HRS caseworker Sharon Anderson visited Doss's apartment and spoke with her daughter. Anderson then took the girl down to the police station to give a recorded statement. Doss went with her daughter to the station, and waited while Detective Sandra Ledegang took her daughter's statement. While Doss was at the station after Ledegang had taken the girl's statement, Ledegang told her the taped statement "was incompetence or something," but that she should not worry because the statement still needed to be typed up. Rowe also introduced evidence indicating that there were factual discrepancies between his daughter's story of abuse and her actual physical condition, which would have given Doss reason to know her daughter was lying.

Those are the facts which the record evidence, viewed in the light most favorable to Rowe, shows regarding his section 1983 claims against Doss. Given these facts, the district court granted Doss summary judgment on Rowe's claims

24

against her, concluding that, with regard to the conspiracy claim, "the record is completely devoid of any evidence upon which the requisite agreement can be inferred." The court also reasoned that because Doss, as a private citizen, cannot be liable under section 1983 unless she is shown to have conspired with one or more state actors, see NAACP v. Hunt, 891 F.2d 1555, 1563 (11th Cir. 1990), when the conspiracy claim against her failed, the substantive claim necessarily failed with it. For the same reason, if we affirm the summary judgment for Doss on the conspiracy claim, we must necessarily affirm the summary judgment on the substantive claim as well.

Conspiring to violate another person's constitutional rights violates section 1983. Dennis v. Sparks, 449 U.S. 24, 27 101 S. Ct.. 183, 186 (1980); Strength v. Hubert, 854 F.2d 421, 425 (11th Cir. 1988), overruled in part on other grounds by Whiting v. Traylor, 85 F.3d 581, 584 n. 4 (11th Cir.1996). To establish a prima facie case of section 1983 conspiracy, a plaintiff must show, among other things, that the defendants "reached an understanding to violate [his] rights." Strength, 854 F.2d at 425 (quotation omitted). The plaintiff does not have to produce a "smoking gun" to establish the "understanding" or "willful participation" required to show a conspiracy, Bendiburg v. Dempsey, 909 F.2d 463, 469 (11th Cir. 1990), but must show some evidence of agreement between the defendants. Bailey v. Bd. of

County Comm'rs of Alachua County, 956 F.2d 1112, 1122 (11th Cir. 1992) ("The linchpin for conspiracy is agreement, which presupposes communication."). For a conspiracy claim to survive a motion for summary judgment "[a] mere 'scintilla' of evidence . . . will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).

Rowe would have us infer that the visitation disputes between him and Doss gave her the motive to encourage her daughter to make false claims of sexual abuse in order to get Rowe "out of the picture." Granting Rowe that inference, however, the other circumstantial evidence simply does not suggest Doss agreed with Lazarus, Ledegang, and Anderson to seek Rowe's unjust prosecution and conviction. At the most, the evidence suggests that Doss coaxed allegations of abuse out of her daughter which she knew were untrue, stayed quiet even though she knew Rowe was being wrongfully prosecuted, and testified untruthfully herself at Rowe's trial.[11] If true, this is reprehensible behavior, but it does not involve a conspiracy between Doss and anyone against Rowe, except between Doss and her

---

[11]Doss is entitled to absolute immunity from liability for her testimony. Mastroianni v. Bowers, 160 F.3d 671, 677 (11th Cir. 1998). Rowe argues that, while it may not itself subject her to liability, Doss's alleged perjury can nonetheless be considered as evidence that she conspired against him. This court, however, has previously considered and squarely rejected this argument. Id. at 1367.

daughter, who is not a state actor. Rowe simply fails to point to any evidence that suggests an "understanding" between Doss and the various state actors who took part in the investigation and prosecution of Rowe. Indeed, he does not even point to any evidence which suggests that, after Doss made the initial complaint, she even knew what Anderson, Ledegang, and Lazarus were doing with the evidence in Rowe's case.

Rowe's best piece of evidence that Doss was aware of, and participated in, a conspiracy actually tends to prove just the opposite – that Doss was kept out of any conspiracy. Rowe claims that when Ledegang told Doss her daughter's recorded statement was "incompetence or something," Doss knew that there were problems and inconsistencies in the girl's statement, and knew Ledegang was planning to "fix" those problems through the transcription. According to Rowe, Doss tacitly joined this conspiracy by assenting to the alteration and later tailoring her own false testimony to bolster the altered story.

To begin with, the full quote from the deposition transcript shows that, far from feeling brought up to speed on the details of a conspiratorial plan, Doss was feeling frustrated at the lack of information that Ledegang provided her:

Q: Did the detectives talk with you about maybe what your

involvement with your daughter should be or how you should talk to

27

your daughter?

A: Nobody gave me any guidance about anything.

 . . . .

No. No one told me anything. Wait a minute. I do think that Detective Ledegang said that her statement was <u>incompetence or something</u>, for some reason, because I kind of said what did she say or something, and she said, 'Don't worry about it. Now it has to be typed up,' or something like that. <u>She didn't want to – seem to tell me anything</u>.

(emphasis added).

Rowe claims Ledegang was telling Doss the statement was incompet<u>ent</u>, presumably meaning 'inadmissible,' or perhaps 'unpersuasive.' But this reading of the words "incompet<u>ence</u> or something" is wrenched out of context and strained. Doss used the phrase "incompetence or something" while discussing her frustration at not being told anything. (She was not present when Ledegang took her daughter's statement, so she had no personal knowledge of what the girl had told Anderson.) Thus, the only piece of evidence Rowe cites to show Doss's awareness of and agreement to participate in a conspiracy actually shows that Doss felt she was being kept in the dark by HRS and the police.

28

More importantly, even assuming Doss knew of Ledegang's plans to alter the transcript, this still would not show that Doss had agreed with Ledegang to do anything, but only that Doss knew Ledegang was planning to doctor the transcript in some unspecified way in an effort to bolster the case against Rowe. That Doss agreed to aid Ledegang in that effort could only be inferred from Doss later perjuring herself at the trial – if she did. But we cannot consider Doss's testimony as evidence of her participation in a conspiracy. See Mastroianni v. Bowers, 173 F.3d 1363, 1367 (11th Cir. 1999); see also Jones v. Cannon, 174 F.3d 1271, 1287 n.10 (11th Cir. 1999) (rejecting an exception for the testimony of "complaining witnesses.")

In sum, Rowe's evidence would not allow a reasonable jury to find even that Doss was aware of a conspiracy, much less that she agreed to participate in one. Rowe's failure to raise a genuine issue of material fact as to Doss's having made an agreement with Ledegang, Anderson, or Lazarus means he failed to raise a genuine issue of material fact on a crucial element of the conspiracy claim. Therefore the district court correctly granted Doss summary judgment on that claim.

As mentioned above, section 1983 does not afford a remedy against a private person unless that person is shown to have conspired with one or more state actors. NAACP v. Hunt, 891 F.2d 1555, 1563 (11th Cir. 1990). Because Rowe's

29

conspiracy claim against Doss fails, his substantive section 1983 claim against her must fail as well. The district court therefore correctly granted Doss summary judgment on Rowe's substantive malicious prosecution claim against her.

## C. DEFENDANTS SATZ'S AND HRS' MOTIONS TO DISMISS

Rowe asserted two state law claims against the Florida Department of Health and Rehabilitative Services and Satz, in his official role as the State Attorney for Florida's 17th Judicial Circuit: one for negligent supervision and training, and one for negligent destruction or loss of evidence (spoliation). In his negligent training and supervision claim, Rowe alleged that Satz's negligent supervision of Lazarus, and HRS's negligent supervision of Anderson and other employees responsible for maintaining records, allowed Lazarus and Anderson to manipulate evidence and conspire against Rowe. In his spoliation claim, Rowe alleged that 1) both HRS and Satz had, and breached, a duty to retain the evidence that was seized in the search of Rowe's apartment; 2) HRS had, and breached, a duty to retain tapes of Doss's initial phone call to the HRS child abuse hotline and copies of the initial HRS Intake Report; and 3) Satz had, and breached, a duty to retain the jump rope that was introduced into evidence at trial.

Satz and HRS moved to dismiss these claims on the grounds that Rowe had

failed to provide them with timely notice of the claims. Florida law requires that a plaintiff wishing to sue Florida, or one of its agencies or subdivisions, must give written notice of the claim to the agency "within 3 years after such claim accrues" in order to invoke the state's waiver of its sovereign immunity. Fla. Stat. ch. 768.28(6)(a). Both parties agree that Rowe gave notice of his claims to Satz and HRS within three years of his release from prison in 1994. They dispute, however, whether this notice was given within three years of the time that his state law claims "accrued." Under Florida law, a claim "accrues when the last element constituting the cause of action occurs." Fla. Stat. ch. 95.031. This means that "a cause of action cannot be said to have accrued, within the meaning of the statute of limitations, until an action may be brought." State Farm Mut. Auto Ins. Co. v. Lee, 678 So. 2d 818, 821 (Fla. 1996). In deciding when the notice-clock began to run on Rowe's state law claims, the question is when the last element of each claim occurred, or, to use the language of Lee, when the action first could have been brought.

Turning to the negligent training and supervision claim first, we begin by analogizing that claim to a convicted defendant's claim against his criminal defense attorney for legal malpractice. A recent Florida Supreme Court decision held that a convict may not bring such a legal malpractice claim while his conviction is still

31

outstanding: appellate or post-conviction relief from the conviction is a necessary element of that claim. Steele v. Kehoe, 747 So.2d 931, 933 (Fla. 1999). The court listed five reasons for its holding:

> (1) without obtaining relief from the conviction or sentence, the criminal defendant's own actions must be presumed to be the proximate cause of the injury; (2) monetary remedies are inadequate to redress the harm to incarcerated criminal defendants; (3) appellate, postconviction, and habeas corpus remedies are available to address ineffective assistance of counsel; (4) requiring appellate or postconviction relief prerequisite to a malpractice claim will preserve judicial economy by avoiding the relitigation of supposedly settled matters; and (5) relief from the conviction or sentence provides a bright line for determining when the statute of limitations runs on the malpractice action.

Id.

Steele addressed the case of a still-incarcerated convicted defendant who was attempting to sue his trial attorney, and it concluded that he could not do so until he succeeded in having his conviction overturned. In a post-Steele case in which Rowe was the plaintiff, Florida's Fourth District Court of Appeals confirmed the

32

corollary: because a convict cannot sue for legal malpractice until he wins his release, the statute of limitations on his malpractice claim does not begin to run until that time. Rowe v. Schreiber, 725 So. 2d 1245, 1250 (Fla. 4th DCA 1999). That is, because obtaining relief from the conviction and being released from prison is an element of a convict's legal malpractice claim, that malpractice claim cannot accrue, and the statute of limitations cannot begin to run, until that element – release – has taken place.

The question, then, is whether the Steele/Schreiber rule applies in this context, to the requirement of timely notice of a negligent training and supervision claim arising from a conviction. Could Rowe have brought his negligent training and supervision claim against HRS and Satz before he was released? If not, then the period for giving notice of the claim did not begin to run until Rowe's release in 1994. Applying the factors relied on by Steele, we believe that, if a still-incarcerated convict sued claiming that negligent training and supervision by government agencies allowed social workers and prosecutors to secure his wrongful conviction, Florida law would deem "the criminal defendant's own actions . . . to be the proximate cause of the injury." Steele, 747 So. 2d at 933. We believe that for the same five reasons the Florida Supreme Court in Steele required a convicted defendant to obtain relief from his conviction before bringing a legal malpractice

33

claim, it would also require him to obtain relief from his conviction before he could bring a monetary claim against those who investigated and prosecuted him. For those purposes, there is no principled basis for distinguishing between a convicted defendant's claims against his attorney on the one hand, and his claims against investigators and prosecutors on the other. So, we conclude that Rowe could not have brought his negligent supervision claim until he was released. That means the three-year period for giving notice of the claim did not start running until then, because the statute does not require that notice be given until the claim has accrued. Fla. Stat. ch. 768.28(6)(a). And it is undisputed that Rowe did give notice of the claim within the requisite three years after his conviction had been set aside.

A similar analysis applies to Rowe's spoliation claim. Applying the Steele factors, it is clear that under Florida law Rowe would not have been allowed to bring a spoliation claim based on the mishandling of evidence so long as the resulting conviction stood. A court would have considered the conviction, and not the spoliation, to be the proximate cause of his injuries. A spoliation claim, under Florida law, alleges that the defendant's negligent loss or destruction of evidence impaired the plaintiff's ability to prove a civil action. Hagopian v. Publix Supermarkets, Inc., 788 So. 2d 1088, 1091 (Fla 4th DCA 2001). Thus, the injury alleged is an injury to the plaintiff's ability to prove his lawsuit. In Rowe's case,

34

the civil action which he says has been impaired by the destruction or loss of evidence is his section 1983 claim for malicious prosecution. Essentially, Rowe contends that if Anderson, Ledegang, and Lazarus had not lost or destroyed exculpatory evidence, he would have been able to rely on that exculpatory evidence to help prove that he was arrested and prosecuted without probable cause.

The injury Rowe alleges in his spoliation claim is an injury to his ability to prove that he was maliciously prosecuted and wrongfully convicted. However, "without obtaining relief from the conviction or sentence, the criminal defendant's own actions must be presumed to be the proximate cause of the injury." Steele, 747 So. 2d at 933. That is, until Rowe won his release, a court would have had to presume that proximate cause of any impairment in his ability to prove he was maliciously prosecuted was the fact that he was not, in fact, maliciously prosecuted, but instead had been validly convicted as a consequence of his own actions. See, e.g, Alamo Rent-A-Car, Inc. v. Mancusi, 632 So. 2d 1352, 1355 (Fla 1994) (under Florida law, "bona fide termination" of the underlying criminal proceeding in favor of the plaintiff is a necessary element of a malicious prosecution claim). Without such a presumption there would be a real danger of the "relitigation of supposedly settled matters," – every convict would have a back door opportunity to undermine his conviction by bringing a civil suit over how his investigators and prosecutors

35

had handled the evidence.  Steele, 747 So. 2d at 933.  Another way of stating this is that the five reasons the Florida Supreme Court gave for its Steele decision apply with as much force to a spoilation claim as to a legal malpractice claim (and, as we have just explained, a negligent supervision claim).

Thus we believe that, under Steele, when a spoilation claim is based on the loss or destruction of evidence that could have served to exculpate a criminal defendant, Florida courts would require appellate or post-conviction reversal of the sentence as a prerequisite for bringing the claim.  And, as we have explained, it follows from that proposition that the time for giving notice of the claim does not begin to run until the sentence is set aside, i.e., the last element of the claim occurs.  Therefore the notice Rowe gave of his spoilation claim, coming as it did within three years of his release, was not untimely.  The district court erred in dismissing Rowe's spoilation claim on the ground that it was.[12]

Finally, we note that, on remand, the district court will have an opportunity to reconsider whether it should retain jurisdiction over these state law claims or dismiss them without prejudice so that these state-law issues can be decided in state court.  A district court has discretion to decline to exercise supplemental jurisdiction

_____

[12]That Rowe gave timely notice of his spoilation claim does not mean that it has merit, or even that it necessarily would survive a motion to dismiss for failure to state a claim. Rowe's state law claims against HRS and Satz are before us on dismissal for untimeliness, and in reversing that dismissal, all that we are deciding about those claims is that they were timely filed.

over the state law claims when:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c); see also Baggett v. First Nat'l Bank of Gainesville, 117 F.3d 1342, 1352-53 (11th Cir. 1997). In this case, (3) certainly applies and (1) may. The district court thus had the discretion to decline to exercise supplemental jurisdiction over the state law claims and dismiss them without prejudice. Instead, it dismissed those claims with prejudice on untimely notice grounds, a dismissal that was erroneous as we have just explained. On remand, however, the district court is free to reconsider whether it will exercise its discretion to decline to exercise supplemental jurisdiction to decide the state law claims.

Among the factors a district court should consider in exercising its discretion are judicial economy, convenience, fairness, and comity. Baggett, 117 F.3d at 1353. Both comity and economy are served when issues of state law are resolved by state

37

courts. See id. The argument for dismissing the state law claims in order to allow state courts to resolve issues of state law is even stronger when the federal law claims have been dismissed prior to trial. See id. (citing United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S. Ct.. 1130, 1139 (1966)).

Though we have made these observations, we are not by any stretch suggesting that the district court abused its discretion by retaining jurisdiction over the state law claims. We are simply pointing out that, because we are reversing the dismissal for untimely notice of Rowe's state law claims against HRS and Satz, on remand the district court will have an opportunity, if it chooses, to revisit the question whether to exercise its supplemental jurisdiction over these claims. The decision on that matter should be and is vested in the sound discretion of the district court.

### III. CONCLUSION

The summary judgments in favor of Lazarus and Doss are AFFIRMED. The dismissal of Rowe's claims against Anderson is AFFIRMED. The dismissal of the state law claims against HRS and Satz for untimely notice of claim is REVERSED and this case is REMANDED to the district court for further proceedings on those claims consistent with this opinion.