[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-10591

Non-Argument Calendar

————————————————

WILLIAM DIXON,
BRIDGET MONTGOMERY,

Plaintiffs-Appellees,

*versus*

CITY OF BIRMINGHAM, ALABAMA,
OFFICER GLASGOW,
individually,

Defendants-Appellants.

————————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:19-cv-02043-AMM

_____

Before JILL PRYOR, BRANCH, and BLACK, Circuit Judges.

PER CURIAM:

The district court granted summary judgment in favor of the defendants on all but two claims: (1) William Dixon's false imprisonment claim against Police Officer James Glasgow and (2) Dixon and Bridget Montgomery's false arrest claim against the City of Birmingham, Alabama (the City). Glasgow and the City appeal. Although the general outline of events on May 22, 2018, is straightforward—there are police body camera recordings for much of it—the parties strongly disagree about what the officers knew and when they learned it. In short, Glasgow and other officers arrested Dixon and Montgomery at their home shortly after their unresponsive infant was taken to the hospital. The infant died later that day, but no charges were ever brought against them. Dixon and Montgomery sued the City, police officers, and detectives under 42 U.S.C. § 1983 for false arrest and illegal search in violation of their Fourth Amendment rights. Taking the evidence and all factual inferences in the light most favorable to Dixon in this interlocutory appeal, we affirm the denial of qualified immunity as to Glasgow and dismiss the City's appeal for lack of jurisdiction.

## I. BACKGROUND

The defendants removed Dixon and Montgomery's state-court complaint to federal court and, after discovery, moved for summary judgment. They asserted the officers were entitled to qualified immunity because they had at least arguable probable cause to arrest Dixon "[c]onsidering the totality of the circumstances including the suspicious death of two infants within a one year period along with Dixon's intoxication on the scene and the description of the child in the past tense." Dixon and Montgomery strongly disputed these assertions in the district court.

The district court spent over 30 pages of its summary judgment order detailing the relevant facts. Much of this summary describes body camera recordings from Officer Glasgow, who was the first police officer dispatched, and Officer Daniel Bridges, who arrived 10 to 15 minutes after Glasgow. Affidavit and deposition testimony fill in the times before and after the recordings. The district court found "[a] reasonable jury viewing the evidence in the light most favorable to Plaintiffs could find that Officer Glasgow, through a 'show of authority,' intentionally terminated Plaintiffs' 'freedom of movement' during his first encounter with Plaintiffs" and that he lacked arguable probable cause to seize the plaintiffs.

While the key facts are relatively short, to understand this case, particularly where the other officers were granted qualified immunity, it is important to have a full factual background. We begin by separating the disputed assertions from the undisputed facts, focusing on the events leading up to Dixon's initial detention

by Glasgow.  For purposes of summary judgment, we accept as true Dixon's version of the disputed facts. *See Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1279 n.9 (11th Cir. 2002).

The following facts are not contested.  When Dixon discovered his infant was unresponsive, he called 911, and the dispatcher assisted him in CPR until Birmingham Fire and Rescue took the baby to the hospital.  Montgomery, who had been at work, met Dixon at their home.  Glasgow was dispatched to the residence concerning an "unresponsive" infant.  He pulled up to the house as the ambulance was leaving and as Dixon, Montgomery, and their two other children were getting in their car to go to the hospital.

Glasgow asked Dixon and Montgomery some general questions about the situation.  After learning Dixon had been with the baby and that the baby had been taken by the ambulance, Glasgow told Dixon and Montgomery to "hold up."  Glasgow called on his radio to find out about the baby's status.  When Glasgow asked how old the baby is, Montgomery said, "She's going to be—she would've been two months on the third."  Using his radio, Glasgow asked someone[1] whether they wanted him "to hold onto the parents at the scene or escort them to [the hospital]."  The person on the radio said, "[inaudible] hold them there."

---

[1] The defendants suggested it was a detective, but the district court found the evidence does not support it being a detective on the radio at that time.  The court noted a reasonable jury could conclude Glasgow was talking to his sergeant.

Glasgow told the parents in the car, "Alright, we can't go yet, so let's just go have a seat inside and we'll talk." The defendants do not dispute Glasgow detained Dixon in the living room although they assert Montgomery was cooperating. Glasgow later testified they were possible suspects and not free to leave at that time. Glasgow had never investigated a child fatality before, but he considered it suspicious whenever an infant dies at a residence.

A few minutes after Officer Bridges arrived, Bridges indicated to Glasgow that Dixon seemed intoxicated,[2] and Glasgow handcuffed Dixon. Glasgow put Dixon in his police car, and Montgomery, who was not in cuffs, was placed in Bridges' car with her two children.

About 30 minutes after Glasgow arrived, he learned the plaintiffs' infant had died at the hospital. Additional officers, including Detective Marcus Robinson, arrived about 15 minutes later. The officers did not tell Dixon and Montgomery of the infant's status. The family was taken to the police precinct where detectives briefly interviewed Dixon and Montgomery, and their house was searched pursuant to a search warrant. No criminal charges were ever brought, but Dixon and Montgomery's other two children

---

[2] The district court determined it was reasonable to interpret Bridges' hand sign as a signal for intoxicated based on the context. The plaintiffs did not dispute that Bridges indicated Dixon appeared intoxicated although, as discussed below, they disputed whether Dixon was actually intoxicated.

were kept in protective custody by the Alabama Department of Human Resources (DHR) for about a year.

Other asserted facts, however, are hotly contested. For example, according to the defendants, Glasgow smelled alcohol on Dixon's breath before Bridges arrived. The plaintiffs vehemently dispute this. They contend Dixon had not been drinking, Glasgow did not mention smelling alcohol on Dixon when he first detained him or when he discussed the situation with a supervisor on the radio, and Bridges was apparently the first person to indicate Dixon appeared intoxicated. The parties also disagree about the significance of Dixon's demeanor, which Glasgow described as both aloof and upset.

Additionally, the plaintiffs had another child who passed away in July 2017, but the parties disagree about when the officers learned this information. The defendants assert Robinson received a dispatch call, looked up the residential address, and "immediately" learned of the prior death. They argue Dixon's arrest was justified, at least in part, because this was the second infant to have died in the plaintiffs' care within a year. They acknowledge, however, that Officer Glasgow was dispatched "[a]pproximately thirty minutes before Detective Robinson was notified of the death of Plaintiffs' infant."[3] The district court stated the evidence supports

---

[3] Robinson testified that dispatch would usually notify detectives once the officers had the scene under control. He also said another detective informed him that no foul play was suspected in the death of the other child.

the plaintiffs' assertion that Glasgow did not know about the prior child's death when he detained Dixon.  The court also concluded "a reasonable jury could find that Detective Robinson had not yet learned that Plaintiffs' other child had died at the time that Officer Glasgow told them to wait to go to the hospital."

Notably, Glasgow and the City do not contest the district court's factual summary on appeal, and the plaintiffs did not file a response brief on appeal.

## II. DISCUSSION

We must determine whether we have jurisdiction before we may address the merits. *Hall v. Flournoy,* 975 F.3d 1269, 1274 (11th Cir. 2020).

### A. Jurisdiction

We construed the plaintiffs' response to a jurisdictional question as a motion to dismiss and carried it with the case.  The plaintiffs acknowledge we generally have jurisdiction to review the district court's denial of summary judgment on qualified immunity grounds but argue we lack jurisdiction where the issue on appeal is purely factual.  While this is true, Glasgow has sufficiently raised a legal question about arguable probable cause such that we have jurisdiction. *See Hall*, 975 F.3d at 1276; *Bryant v. Jones*, 575 F.3d 1281, 1294 n.19 (11th Cir. 2009).

The denial of summary judgment on a municipal liability claim, however, is not generally immediately appealable.  The City argues we should nevertheless exercise pendent appellate

jurisdiction to review the denial of summary judgment on the claim against it. The doctrine of pendent appellate jurisdiction allows us to address otherwise nonappealable orders if they are "inextricably intertwined" with an appealable decision or if review of the former is "necessary to ensure meaningful review of the latter." *Hudson v. Hall*, 231 F.3d 1289, 1294 (11th Cir. 2000) (quotation marks omitted). Nothing about whether the City had an unconstitutional policy is "essential to the resolution" of whether Glasgow is entitled to qualified immunity. *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 51 (1995) (quotation marks omitted). "While the claims presented stem from a single incident, the municipal-liability claim raises the wholly separate issue of whether [the City] had a policy, custom, or practice of deliberate indifference and inadequate training of its officers . . . ." *Jones v. Fransen*, 857 F.3d 843, 850 (11th Cir. 2017). We therefore lack jurisdiction to review the denial of summary judgment on the municipal liability claim.

We grant the motion to dismiss in part as to the City's appeal and address only whether Glasgow is entitled to qualified immunity.

## B. Denial of Qualified Immunity

We agree with the district court that Glasgow seized Dixon for Fourth Amendment purposes when he told Dixon and Montgomery to "hold up" and go back inside the house for questioning because the record is clear they were not free to leave. *See West v. Davis*, 767 F.3d 1063, 1067-70 (11th Cir. 2014). Glasgow was acting within his discretionary authority at that point, so he is entitled

to qualified immunity unless Dixon can show Glasgow violated his constitutional rights and that the right was clearly established at the time of the violation. *See Washington v. Howard*, 25 F.4th 891, 897-98 (11th Cir. 2022). That turns on whether Glasgow had arguable probable cause to arrest Dixon.[4]

Glasgow contends the district court incorrectly applied an older, more demanding standard of arguable probable cause and that the correct, new standard is set forth in *D.C. v. Wesby*, 138 S. Ct. 577, 586 (2018). He argues a reasonable officer could have concluded there was a substantial chance Dixon had committed any of several crimes, including domestic violence in the first degree. *See* Ala. Code § 13A-6-130.[5]

---

[4] We review the denial of summary judgment on qualified immunity grounds *de novo*. *Reams v. Irvin*, 561 F.3d 1258, 1262-63 (11th Cir. 2009). To the extent Glasgow suggests on appeal he had arguable reasonable suspicion to conduct an investigatory stop—rather than arguable probable cause to conduct an arrest—he did not present it to the district court in a manner that would allow the court "an opportunity to recognize and rule on it." *CSX Transp., Inc. v. Gen. Mills, Inc.*, 846 F.3d 1333, 1336 (11th Cir. 2017) ("A federal appellate court will not, as a general rule, consider an issue that is raised for the first time on appeal."). Even if Glasgow had preserved the investigatory stop argument, he needed arguable probable cause to arrest the plaintiffs, and there remains a genuine dispute about material facts such that this case could not be decided on summary judgment.

[5] "A person commits the crime of domestic violence in the first degree if the person commits the crime of assault in the first degree pursuant to Section 13A-6-20" and the victim is a child or a present household member. Ala. Code § 13A-6-130(a)(1). "A person commits the crime of assault in the first degree

We recently explained "that the correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to 'ask whether a reasonable officer could conclude . . . that there was a substantial chance of criminal activity.'" *Washington*, 25 F.4th at 902 (quoting *Wesby*, 138 S. Ct. at 588). To determine whether an officer had probable cause for an arrest, "we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Wesby*, 138 S. Ct. at 586 (quotation marks omitted). In other words, "we must look at the totality of the circumstances." *Washington*, 25 F.4th at 902 (quotation marks omitted).

The issue currently before us concerns what Glasgow knew when he arrested Dixon, viewing the evidence and all factual inferences in the light most favorable to Dixon. *See Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010); *Rowe v, City of Ft. Lauderdale*, 279 F.3d 1271, 1279 n.9 (11th Cir. 2002). At the time of the arrest, viewing the evidence and all factual inferences in the light most favorable to Dixon, Glasgow did not know the status of the infant in the ambulance, and the parties dispute when Glasgow came to believe Dixon was intoxicated and when any law enforcement officer working on this case became aware of the prior child's

---

if: . . . [u]nder circumstances manifesting extreme indifference to the value of human life, he or she recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes serious physical injury to any person . . . ." Section 13A-6-20(a)(3).

death in 2017. Accepting Dixon's version of disputed facts as true, Glasgow knew only that (1) an unresponsive infant had been taken to the hospital by ambulance following a 911 call, (2) Dixon was the caretaker, and (3) Montgomery arrived before the police and said the infant "would've been two months on the third." Without more, an objective officer in Glasgow's position could not have reasonably believed there was a substantial chance of criminal activity—whether domestic violence or some form of homicide—and Glasgow therefore lacked arguable probable cause. *See Washington*, 25 F.4th at 897, 899.

"Where an officer arrests without even arguable probable cause, he violates the arrestee's clearly established Fourth Amendment right to be free from unreasonable seizures." *Carter v. Butts Cnty.*, 821 F.3d 1310, 1320 (11th Cir. 2016). Consequently, Glasgow's contention that he is still entitled to qualified immunity because the plaintiffs failed to present a controlling and materially similar case is unavailing.

Based on this record, the district court did not err in denying Glasgow's motion for summary judgment. Whether Glasgow can prove the disputed facts and ultimately prevail at trial is for the jury to decide.

## III. CONCLUSION

We **DENY** the motion to dismiss for lack of jurisdiction as to the denial of qualified immunity but **GRANT** the motion in part as to the denial of summary judgment on the claim against the City.

We **DISMISS** the appeal as to the municipal liability claim and **AFFIRM** the district court's denial of Glasgow's motion for summary judgment on qualified immunity grounds.