Steven AISENBERG et al., Plaintiffs,

v.

**HILLSBOROUGH COUNTY SHERIFF'S OFFICE et al., Defendants.**

No. 8:03–cv–2063–T–23EAJ.

United States District Court, M.D. Florida, Tampa Division.

July 16, 2004.

See also, 358 F.3d 1327.

Barry A. Cohen, Todd Foster, Michael A. Gold, Stephen L. Romine, Harry M. Cohen, Kevin J. Darken, Cohen, Jayson & Foster, Tampa, FL, Stephen Yagman, Marion R. Yagman, Yagman & Yagman & Reichmann, Venice Beach, CA, for plaintiffs.

J. Robert Sher, Washington, D.C. for defendants.

## ORDER

MERRYDAY, District Judge.

The Aisenbergs sue Assistant United States Attorneys Stephen Kunz and Rachelle DesVaux Bedke; the Hillsborough County Sheriff's Office (the "HCSO"); Sheriff Cal Henderson; Major Gary Terry; Lieutenant Greg Brown; Sergeant Robert Bullara; HCSO detectives Linda Burton and William Blake; Corporal Don Roman; detective and polygrapher Carlos Somellan; Deputies Jussara Olmeda, Chad Chronister, Phillippe Dubord, Miguel Diaz, Fernando Enriquez, Alfred Ford, Lester Orgeron, Michael Bryant and Billy Williams; and the United States' audio "expert", Anthony Pellicano. The Aisenbergs assert claims that purportedly arise from the investigation and aborted criminal prosecution of the Aisenbergs following the disappearance of their infant daughter, Sabrina.

The Aisenbergs sue Kunz and Bedke in their individual capacity for "acts . . . within the course and scope of . . . [their] authority and the course of . . . [their] employment" and assert four claims.[1] The

---

1. The Aisenbergs sue Burton, Blake, Bullara, Brown, Roman, Somellan; Olmeda, Dubord,

Aisenbergs assert two claims under the United States Constitution pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The Aisenbergs assert a violation of the Fourth Amendment's prohibition against unreasonable search and seizure and allege material misrepresentations in an application to surreptitiously intercept the Aisenbergs' oral communications. The Aisenbergs assert another violation of Fourth and Fifth Amendment rights arising from an unreasonable seizure caused by, and criminal charges based on, fabricated evidence. The Aisenbergs also assert a claim pursuant to Section 1983 of Title 42, United States Code ("Section 1983"), for the alleged participation of Kunz and Bedke in a conspiracy with individuals acting under color of state law to violate the Fourth and Fifth Amendments by filing "criminal charges based on false or ... fabricated evidence." Finally, the Aisenbergs assert a state law claim for intentional infliction of severe emotional distress (Doc. 2). The Aisenbergs also sue Peilicano (1) pursuant to *Bivens* for violation of the Fourth and Fifth Amendments for fabrication of evidence; (2) pursuant to Section 1983 for allegedly participating in a conspiracy with individuals acting under color of state law to violate the Fourth and Fifth Amendment by filing "criminal charges based on false or ... fabricated evidence;" and (3) pursuant to state law for intentional infliction of severe emotional distress.

Kunz, Bedke, and the United States, which substituted for Kunz and Bedke as

defendant for the Aisenbergs' state law tort claim (Doc. 4), removed this action, originally filed in state court (Doc. 1). Each defendant moves to dismiss the Aisenbergs' claims (Docs. 5, 7, 18, 20–32, 35, 54–57, 95, & 114) and each defendant except for Kunz, Bedke, the United States, and Pellicano moves to remand the action (Docs. 61, 62, & 105).

## I. BACKGROUND

### A. The initial investigation

According to the complaint, following the disappearance of their infant daughter Sabrina, on the morning of November 24, 1997, the Aisenbergs called "911" emergency services.[2] Authorities responded and searched for the infant. Members of the HCSO, the Federal Bureau of Investigation (the "FBI"), and the Florida Department of Law Enforcement formed the "Sabrina Task Force" to investigate the infant's disappearance. The HCSO led the investigation, Terry commanded the task force, Burton and Blake participated as "co-lead detectives," and Kunz and Bedke "advised and helped direct" the task force and attended task force meetings. Almost immediately the authorities suspected the Aisenbergs' involvement in Sabrina's disappearance and, according to the complaint, Kunz and Bedke "assisted investigators in developing potential leads in an effort to implicate the Aisenbergs in their daughter's disappearance." [3]

To surreptitiously install listening devices in the Aisenbergs' home, Blake and Burton submitted in state court on De-

---

Chronister, Diaz, Enriquez, Ford, Orgeron, Bryant, and Williams in their individual capacity and Henderson and Terry in both their individual and their official capacity.

**2.** Unless otherwise noted, the facts originate from the complaint. *See, e.g., GJR Invs., Inc. v. Escambia County*, 132 F.3d 1359, 1367 (11th Cir.1998).

**3.** According to the complaint, "[w]ithin the first hours of Sabrina's disappearance, investigators told Marlene Aisenberg that they believed she was responsible for Sabrina's disappearance."

cember 12, 1997, an "Application for the Interception of Oral Communications." The Aisenbergs allege "upon information and belief" both that "the decision to apply for the Original Application was made after consultation with . . . Kunz and Bedke" and that "Kunz and Bedke offered legal advice on the propriety and drafting of the Application for Interception of Certain Oral Communications." [4] Following approval of the application, the authorities furtively installed listening devices in the Aisenbergs' bedroom and kitchen. The devices generated poor quality and often inaudible recordings that featured excessive background noise and other audio interference.

On approximately January 9 and February 11, 1998, Burton and Blake applied for and received extensions of the intercept application from the state court, which intercepts terminated in the spring of 1998.[5] The intercept extension applications included transcripts and summaries, both of which purported to recount intercepted and incriminating communications. According to the complaint, the applications, transcripts, and summaries contained intentional or reckless misrepresentations and other false information to deceive the reviewing tribunal. Although Diaz, Olmeda, Enriquez, Dubord, Orgeron, and Chronister prepared the initial drafts, Burton and Blake were "ultimately responsible" for drafting and completing the transcripts of intercepted communications used as exhibits for the first and second intercept extension applications. Further, the HCSO officers that monitored the inter-

cepts, which included Enriquez, Diaz, Dubord, Ford, and Chronister, prepared the summaries with input from Burton and Blake.[6] The Aisenbergs allege "upon information and belief" that "Kunz and Bedke had knowledge of the[ ] intentional misrepresentations [in the first and second extension applications] and promoted these falsehoods in their effort to falsely inculpate the . . . [Aisenbergs] and manufacture a criminal case against them."

Beginning in December, 1997, the defendants delivered the recordings to the FBI's Washington, D.C., laboratory for audibility improvement. From December 29, 1997, to June 6, 1999, the defendants delivered over 50 audiotapes to the FBI laboratory, including audiotapes containing the purported conversations recounted in the intercept extension applications. "Simultaneous" with the FBI laboratory's audiotape analysis, beginning in December, 1997, the defendants learned of both the "poor quality" and audibility problems and the "inability to improve [the] sound quality" of the recordings. Further, in attempts to delay notice of surreptitious recording, on both February 24 and May 26, 1999, Kunz informed a court that the quality of many of the audiotapes required submission to an audio laboratory for clarification.

In December, 1997, Kunz, Bedke, and other defendants notified the press of the possible involvement in Sabrina's disappearance of a white van, although investigators had already eliminated its relevance. According to the complaint, the

4. Kunz and Bedke challenge the propriety of any allegation based on information and belief (Doc. 6). However, Kunz and Bedke cite no authority that precludes consideration of allegations based on information and belief in an action not contemplated by Rule 9, Federal Rules of Civil Procedure.

5. Roman drafted the February 11th intercept extension application "based on 'facts' provided by . . . Burton and Blake."

6. The complaint alleges also that "Defendant Debold" monitored an intercept. However, the complaint neither identifies nor otherwise names as a defendant any party named Debold.

defendants knew that the Aisenbergs owned a white van and that disclosure of a white van's possible involvement would cast the public's suspicion on the Aisenbergs.

In January, 1998, Bullara informed the Florida Department of Health and Rehabilitative Services ("HRS") that a November 23, 1997, videotape of Sabrina made by the Aisenbergs [7] indicated potential abuse.[8] The following month, HRS investigators met with the Aisenbergs and Sabrina's siblings, William and Monica. HRS eventually concluded that no reason existed to remove the Aisenberg children from their parents' custody and closed the investigation in October, 1998. The Aisenbergs allege "upon information and belief" that Kunz and Bedke "were involved" in the decision to contact HRS "to use HRS to intimidate the Aisenbergs and influence their conduct," discussed the HRS investigation with the HCSO and HRS, and requested HRS investigation reports.

### B. The Grand Jury Proceedings

The authorities convened a grand jury, which, according to the complaint, Kunz and Bedke used as an "investigative tool" from approximately December 1, 1997, to "at least" March, 1998, during which period the government lacked probable cause to arrest the Aisenbergs. Grand jury subpoenas issued beginning on December 1, 1997. According to the complaint, Kunz and Bedke conspired with Burton to solicit materially false and misleading testimony, to distort the truth, to deceive grand jurors, to "recklessly and corruptly" influence the investigation of Sabrina's disappearance, and to "frame" the Aisenbergs.

Specifically, on February 4, 1998, Kunz questioned Burton in the grand jury proceedings. Burton "detailed" the intercepted conversations recounted in the first intercept extension application, although Kunz knew about both the application's untruthfulness and the inaudibility of intercepted recordings. Burton also testified that doctors who viewed the November 23rd videotape (1) thought that Sabrina "appeared" to have a bruise beneath her left eye, a bruise on her face, a "marked" area under her lip, and a bruise on her arm and (2) "believed" that Sabrina displayed a "linear cut on the head where the hair had been pulled out." However, Kunz knew the doctors never opined that the video evidenced any abuse. Further, Burton testified that, according to Sabrina's hairdresser, Sabrina's hair "looked like it had been rubbed off and hair had been pulled down over it to cover it." However, neither Kunz nor Bedke told the grand jurors that the hairdresser "likened the allegedly missing hair to that of all infants whose hair is rubbed off during the course of the day." Burton also testified that various individuals who attended a birthday party, also attended by Sabrina on the day before Sabrina's disappearance,[9] described Sabrina as "dirty," not wearing "clean clothes," sleeping "most of the time," and refusing a bottle. However, several of these individuals later testified in a pre-trial hearing that Sabrina showed no sign of abuse. Finally, Burton testified that an eight year-old girl at the birthday party "didn't have anything to say" about signs of abuse. However, in a later pre-trial hear-

---

7. The complaint identifies the videotape's date also as November 22, 1997. However, the videotape's correct date plays no role in the resolution of the parties' motions.

8. Florida renamed HRS as the Department of Children and Families.

9. The complaint identifies November 24, 1997, implausibly as the date of both the birthday party and Sabrina's disappearance.

ing, the girl's father testified that his daughter stated that Sabrina displayed no physical sign of abuse. The complaint also alleges that Bedke "permitted" Burton to testify that the Aisenbergs purchased no baby food on November 24, 1997, although Bedke possessed a Publix receipt demonstrating the purchase of baby food by the Aisenbergs.

At Kunz's request, on October 21, 1998, Burton read for the grand jury the transcripts of purportedly intercepted communications attached as exhibits to the intercept extension applications. According to the complaint, Kunz knew both that the transcripts failed to reflect the truth and that "many of the tapes were largely inaudible" Further, on September 8, 1999, Kunz "permitted" Burton to testify for the grand'jury that Steven Aisenberg's reference in an intercepted communication to a "clip backfiring on us" referred to a People magazine article about Sabrina's disappearance although on November 11, 1998, Burton had testified that "backfiring" referred to the November 23rd videotape.

According to the complaint, the United States subpoenaed the Aisenbergs to testify before the grand jury on February 4, 1998. Although the Aisenbergs informed Kunz, Bedke, and others of their intention to invoke the Fifth Amendment privilege against self-incrimination, Kunz and Bedke refused to release the Aisenbergs from the subpoena.[10] Following a motion, the Aisenbergs received a brief continuance of their grand jury appearance until February 11, 1998. The Aisenbergs allege "upon information and belief" that Kunz and Bedke leaked to the press the Aisenbergs' scheduled February 11th grand jury appearance. According to the complaint, the leak "was designed to prejudice the potential jury pool" through press speculation that the Aisenbergs' brief presence in the grand jury room evidenced their refusal to testify.

During the Aisenbergs' grand jury appearance, Kunz asked "questions which . . . Kunz and Bedke knew were false and misleading but were nonetheless asked for the sole purpose of corruptly prejudicing the grand jurors during their investigation of this matter."[11] Kunz asked the Aisenbergs both whether any family member was taking medication and about Sabrina's hair. In addition, Kunz asked Steven Aisenberg whether he observed any injuries on Sabrina's face and whether he would provide any information to assist the grand jury "in trying to identify those individuals who were responsible for the disappearance of Baby Sabrina," Kunz asked Marlene Aisenberg why Sabrina slept an "extensive" amount; whether Sabrina had any bruises before her disappearance; why the November 23rd videotape demonstrated both "some apparent injuries" to Sabrina's face and hair missing from Sabrina's scalp; whether investigators interviewed Marlene Aisenberg; whether Marlene Aisenberg ever observed Steven Aisenberg's mistreatment of the children; whether Steven Aisenberg had a history of violent behavior; whether Steven Aisenberg exhibited violent behavior after his resignation from an employer in Virginia following an allegation of sexual assault; and whether

---

10. According to the complaint, Kunz, Bedke, and other defendants refused to release the Aisenbergs from appearing in the grand jury proceeding in an effort "to improperly influence the investigation by promoting media speculation that the Aisenbergs invoked their privilege against self-incrimination" (Doc. 2). "Kunz and Bedke were aware, through experience and by notice from the Aisenbergs'. counsel, that the public believes that any person who invokes their privilege against self-incrimination is guilty of the alleged conduct."

11. According to the complaint, the questions "would 'deceive' the grand jury to believe the facts in the question where [sic] true."

Marlene Aisenberg would provide the grand jury with any information "concerning the disappearance" of Sabrina.[12]

On September 9, 1999, the grand jury indicted the Aisenbergs for (1) making false statements during both the Aisenbergs' initial report of Sabrina's disappearance and the consequent investigation in violation of Sections 1001 and 1002 of Title 18, United States Code, and (2) conspiring to perpetrate deceptions that violated Sections 1001 and 1002 in violation of Section 371 of Title 18, United States Code. Although the indictment, drafted by Kunz and Bedke, focuses on and recounts purportedly intercepted conversations, according to the complaint, the indictment contains reckless and "corrupt" misrepresentations.[13]

## C. The Press Conference

The Aisenberg indictment was announced at a September 9, 1999, press conference in the Tampa office of the United States Attorney. According to the complaint, Kunz, Bedke, and other defendants attended the press conference and an official representative, unidentified in the complaint, announced that the Aisenbergs "lied to enforcement authorities concerning the circumstances surrounding the baby's disappearance and their reaction to it, as well as the condition of the baby at the time of the reported kidnapping [and] discussed on several occasions that the baby was actually dead and what story they would tell authorities concerning the disappearance of the baby." According to the complaint, the information announced at the press conference resulted from the "lies and false statements created by . . .

Kunz and Bedke and included in the indictment."

## D. Matters Following The Indictment

During the Aisenbergs' initial appearance, Bedke told a Maryland federal district judge that in the intercepted communications Steven Aisenberg states "I wish I hadn't harmed her. It was the cocaine." Bedke added that the United States possessed "other taped statements of both Steven Aisenberg and Marlene Aisenberg that indicate, based on the quality of their statements and their behavior, that—you can hear that they are drugged."

Shortly after Barry Cohen and Todd Foster appeared as counsel for the Aisenbergs, Kunz and Bedke sought both to disqualify counsel and to require retention of separate, independent counsel for each of the Aisenbergs. According to the complaint, Kunz and Bedke sought disqualification of Cohen and Foster to "further oppress, threaten, and isolate" the Aisenbergs.

In response to several motions by the Aisenbergs that challenged the intercepted communications, including a motion to suppress the recordings, Kunz and Bedke wrote that the "[g]overnment's position is that a tape recording does exist which contains the conversations disputed by the defendants." Further, Kunz and Bedke wrote that the "government emphatically disputes the defendants' version of the recorded conversation in question and the outrageous suggestion that the government has made any misrepresentations to the Court. . . . The government stands behind the accuracy of the representations

---

12. The complaint alleges, "upon information and belief," that Kunz, Bedke, and other defendants both notified the media of their travel to Maryland to investigate an alleged sexual harassment claim against Steven Aisenberg and revealed the alleged victim's identity.

13. According to the Aisenbergs, the indictment conveys both Steven Aisenberg's responsibility for Sabrina's death and Marlene Aisenberg's assistance with a "cover up."

concerning the content of the tape recording in question." Kunz and Bedke also wrote that "government agents" reviewed all audiotaped recordings "extensively" and that "government agents" prepared a transcript submitted to the court on January 5, 2000, and Kunz and Bedke "also reviewed the tape recording and concur in the transcript prepared by the agents."

During a March 31, 2000, court hearing, Bedke stated that government "agents have been working diligently to make the[ ] [transcripts of audio recordings to be used at trial] perfect;" that Kunz and Bedke were "obligated ... to review those transcripts with the tapes, to make sure that [they felt] ... comfortable that that task has been accomplished;" and that Kunz, Bedke, and the agents were "working on these tapes and transcripts." In addition, Kunz and Bedke wrote that they "reviewed the tape recording and concur in the transcript prepared by the [government] agents." According to the complaint, Kunz and Bedke drafted the transcripts "knowing or in reckless disregard for the fact that the conversations allegedly reflected in the transcripts could not be heard."

Kunz and Bedke retained Anthony Pellicano as an "expert" to corroborate Kunz and Bedke's version of the Intercepted communications. Pellicano had no formal training in audiotape examination and, according to the complaint, was retained because of his willingness to fabricate evidence and because no "reputable authority would agree to support [Kunz and Bedke's] ... endeavor to deceive the district court" and potential jurors. In explanation of Pellicano's retention, Kunz and Bedke wrote that " 'the FBI laboratory analyst who had examined some of the recordings either did not have the time, equipment, experience or training—or simply did not take the time and/or expend the effort—necessary to properly enhance each part of each recording.' " According to the complaint, "Pellicano corruptly transcribed several conversations in anticipation of hearings before the court in that he corroborated Defendants' false versions of the contents of the intercepted conversations."

At a pre-trial hearing on December 19, 2000, although characterizing the intercepted communication differently for the grand jury, Kunz "permitted" Burton to testify that Steven Aisenberg's reference to a "clip backfiring on us" referred to the Aisenberg's November 24, 1997, videotaped plea for Sabrina's return.

On February 14, 2001, after referral of the Aisenbergs' motion, United States Magistrate Judge Mark A. Pizzo recommended suppression of the recordings of intercepted communications.[14] Magistrate Judge Pizzo found that Burton and Blake made reckless and false statements in the initial intercept application and that "detectives" deliberately or recklessly misrepresented the Aisenbergs' intercepted communications in transcripts filed with intercept extension applications. Magistrate Judge Pizzo continued that the United States "steadfastly reject[ed]" that detectives misrepresented the Aisenbergs' communications, although the record demonstrated "systemic, technical problems producing recording plagued by distortion, interference, and mechanical noises; application transcripts that make no sense; revised transcripts that continue to make no sense; revised transcripts that contradict application transcripts in material respects; a continual effort to amend transcripts (to purportedly improve them) up to and through the date of this report; admissions, as evidenced by the govern-

14. The Aisenbergs attached Magistrate Judge Pizzo's February 14, 2001, report and recommendation to their opposition to Kunz and Bedke's motion to dismiss (Doc. 15).

ment's transcripts, that significant amounts of particular conversations cannot be understood or were not recorded ...; and the government's tacit acknowledgment that certain recordings are so poor or so irrelevant it will not offer them as evidence at trial." On February 21, 2001, before the district court's consideration of Magistrate Judge Pizzo's report and recommendation, the United States moved for and the next day the district court granted dismissal of the indictment.

### E. The Aisenbergs' Motion Pursuant to the Hyde Amendment

Following dismissal of the indictment, the Aisenbergs moved for attorneys' fees and costs pursuant to the Hyde Amendment, Section 617 of Public Law Number 105–119, 111 Stat. 2440, 2519 (1997), which requires reimbursement of defense costs for "vexatious, frivolous, or ... bad faith [prosecution]." In an unprecedented step, the United States conceded the application of the Hyde Amendment. The January 31, 2003, order announcing the fee and cost award explains that:

> Before the September 28, 2000, hearing, I had thoroughly reviewed the thirty-two compact discs intended for use by the United States as evidence against the Aisenbergs at trial. I had played each disc in sequence until completion. As I reviewed the recordings, I recalled that the United States had expressed repeatedly that the recordings were the motive force and principal support for its case against the Aisenbergs. The lengthy indictment included strongly inculpatory quotations attributed to the Aisenbergs, quotations avowedly derived from the thirty-two compact discs and prominently featured by the United States at a conspicuous news conference held to announce the indictment a year earlier. But after careful review, I heard none of it. I heard many inaudible utterances, none of them decidedly

and reliably inculpatory.... I promptly began another extended review of the recordings, now employing the transcripts provided by the United States and the Aisenbergs. I listened to the recordings and compared what I heard with the transcripts provided by the United States. The disparity was shocking.

*United States v. Aisenberg,* 247 F.Supp.2d 1272, 1284 (M.D.Fla.2003), *rev'd in part,* 358 F.3d 1327 (11th Cir.2004). The January 31, 2003, order extensively details the history of the investigation and aborted criminal prosecution.

### II. THE ASSISTANT UNITED STATES ATTORNEYS' MOTION TO DISMISS

Kunz and Bedke move to dismiss the Aisenbergs' *Bivens* and Section 1983 claims and assert (1) that absolute immunity protects Kunz and Bedke from liability for prosecutorial functions; (2) that qualified immunity protects Kunz and Bedke from liability because the complaint states no claim for violation of a "clearly established" constitutional right; (3) that Hyde Amendment remedies preclude the Aisenbergs' claims; (4) that the complaint insufficiently alleges a conspiracy; and (5) that the complaint contains Insufficient allegations for maintenance of the Section 1983 claims because Kunz and Bedke acted within the scope of their federal authority (Docs. 5 & 6). The Aisenbergs respond that (1) Kunz and Bedke functioned as investigators rather than prosecutors and, consequently, receive no absolute immunity; (2) Kunz and Bedke violated "clearly established" constitutional rights; (3) the Hyde Amendment precludes no claim because the legislation fails to provide a comprehensive statutory remedial scheme; (4) the complaint contains sufficient allegations to avoid dismissal of any claim; and (5) Kunz and Bedke conspired with state agents to deny the Aisenbergs' constitu-

tional rights under color of state law (Doc. 15).

## A. Absolute Immunity

### 1. Advocacy For The United States

■ Absolute immunity exists to "free the judicial process from the harassment and intimidation associated with litigation." *Burns v. Reed,* 500 U.S. 478, 494 & 495, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991); *see Imbler v. Pachtman,* 424 U.S. 409, 423, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (a prosecutor's immunity arises from a concern that "harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust."). Because protection of the prosecutorial function, rather than protection of prosecutors themselves, justifies prosecutorial immunity, the availability of absolute immunity depends on the nature of the function performed. *Buckley v. Fitzsimmons,* 509 U.S. 259, 269 & 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) ("[T]he actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor."); *Kalina v. Fletcher,* 522 U.S. 118, 125, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997).[15]

A prosecutor receives absolute immunity only for acts "that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." *Burns,* 500 U.S. at 494 & 495, 111 S.Ct. 1934 (the determination of whether absolute immunity applies requires inquiry into "whether the prosecutor's actions are closely associated with the judicial process"). Specifically, a prosecutor receives absolute immunity for acts performed "in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of [the prosecutor's] ... role as an advocate for the [government] .... Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Buckley,* 509 U.S. at 273, 113 S.Ct. 2606; *see Rowe v. Fort Lauderdale,* 279 F.3d 1271, 1279–89 (11th Cir. 2002); *Jones v. Cannon,* 174 F.3d 1271, 1281–82 (11th Cir.1999); *see also Long v. Satz,* 181 F.3d 1275, 1279 (11th Cir.1999) (dismissal based on immunity from suit requires allegations in the complaint that the defendant performed prosecutorial functions). Acts that entitle a prosecutor to absolute immunity include the initiation and pursuit of a criminal prosecution, court appearances, and in-court activity. *Rowe,* 279 F.3d at 1279. For qualifying acts, a prosecutor receives absolute immunity regardless of the prosecutor's motive or intent. *See Grant v. Hollenbach,* 870 F.2d 1135, 1138 (6th Cir.1989) ("Absolute prosecutorial immunity is not defeated by a showing that the prosecutor acted wrongfully or even maliciously ....") (quotations omitted); *see also Rowe,* 279 F.3d at 1279–80 (a prosecutor remains absolutely immune for knowingly proffering perjured testimony and fabricated exhibits at trial).[16] The pertinent analysis focuses on

---

**15.** Although *Buckley* and other decisions cited both in this order and by the parties consider immunity from Section 1983 rather than from *Bivens* claims, the application of immunity remains the same. *See Malley v. Briggs,* 475 U.S. 335, 340 n. 2, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

**16.** Absolute immunity may leave a "genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty." *Imbler,* 424 U.S. at 427, 96 S.Ct. 984. However, remedies available during a prosecution and after trial and the threat of criminal and professional sanction offer some deterrence and avenue of punishment for a prosecutor's will-

the prosecutor's conduct, not on the resulting injury, and requires acceptance of the allegations in the complaint. *Kalina,* 522 U.S. at 122, 118 S.Ct. 502; *Buckley,* 509 U.S. at 271–72, 113 S.Ct. 2606; *see Rivera v. Leal,* 359 F.3d 1350, 1351 (11th Cir. 2004). Further, the prosecutor retains the burden of demonstrating entitlement to absolute immunity. *Buckley,* 509 U.S. at 269, 113 S.Ct. 2606; *Rivera,* 359 F.3d at 1353.

Advocacy for the government subject to absolute immunity includes the preparation and filing of charging documents, including the indictment. *See Baez v. Hennessy,* 853 F.2d 73, 75 (2d Cir.1988) (the preparation of the indictment affords the prosecutor absolute immunity); *see also Kalina,* 522 U.S. at 120 & 129, 118 S.Ct. 502 (the selection of facts to include in and the drafting of the certification, the determination that evidence demonstrates probable cause, the decision to file charges, and the presentation of the information and motion to the court involves the exercise of professional judgment by a government advocate and receives absolute immunity). Accordingly, Kunz and Bedke receive absolute immunity for the drafting of the indictment despite the complaint's allegations that the indictment contains "reckless" and "corrupt" misrepresentations.

Advocacy for the government subject to absolute immunity also includes the adoption of a prosecution strategy and the consequent acts and representations made either in writing or orally to a court. *See Buckley,* 509 U.S. at 271, 113 S.Ct. 2606 (the presentation of evidence in court receives absolute immunity); *Rowe,* 279 F.3d at 1279; *see also Imbler,* 424 U.S. at 431,

96 S.Ct. 984 (a prosecutor's "presentation" of a case receives absolute immunity). Accordingly, Kunz and Bedke receive absolute immunity (1) for filing in court on February 24 and May 26, 1999, in attempts to delay notice of surreptitious recording, papers representing that many of the recordings of intercepted communications required submission to an audio laboratory for clarification; (2) for drafting and submitting in court any transcript of purportedly intercepted communications;[17] (3) for revealing purportedly incriminating intercepted communications in a Maryland federal district court during the Aisenbergs' initial appearance; (4) for seeking both to disqualify Cohen and Foster and to force the Aisenbergs' retention of separate counsel; (5) for both oral and written representations submitted in court about the nature or quality of the intercepted communications and the transcription process; (6) for retaining Pellicano as an "expert"; and (7) for "permitting" Burton to testify during a December 19, 2000, pre-trial hearing about Steven Aisenberg's "clip backfiring" statement.

### 2. "Investigative" Acts

■ The investigatory functions of a prosecutor "that do not relate to ... [the] preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley,* 509 U.S. at 273, 113 S.Ct. 2606. A legal distinction exists between "the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial ... and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend

---

ful conduct. *See Imbler,* 424 U.S. at 427–29, 96 S.Ct. 984.

**17.** The complaint alleges that Kunz and Bedke drafted the transcripts but provides no date for the transcripts' creation. However, the complaint's other pertinent allegations demonstrate that Kunz, Bedke, and other government agents drafted the transcripts after the commencement of the Aisenbergs' prosecution for use at trial.

that a suspect be arrested." *Buckley,* 509 U.S. at 273, 113 S.Ct. 2606; *see Mullinax v. McElhenney,* 817 F.2d 711, 715 (11th Cir.1987) ("A prosecutor's role as an advocate necessarily entails the development and evaluation of a case prior to the formal initiation of a prosecution.... Thus, a prosecutor is entitled to absolute immunity for the factual investigation necessary to prepare a case, including interviewing witnesses before presenting them to the grand jury.... On the other hand, ... direct participation with the police in conducting a search far exceeds the prosecutor's necessary role in marshaling the facts of a case."). Generally, a prosecutor acts as an investigator and receives no absolute immunity when searching in the field for clues and corroboration, such as when, before an indictment, a prosecutor either visits a crime scene to identify the source of a bootprint or participates in the search of a suspect's dwelling. *Rivera,* 359 F.3d at 1353 (citing *Buckley,* 509 U.S. at 273, 113 S.Ct. 2606, and *Rowe,* 279 F.3d, at 1280); *see Marrero v. City of Hialeah,* 625 F.2d 499 (5th Cir.1980) (a prosecutor acts as an investigator when he accompanies a police officer and participates in the execution of a search warrant).

The Aisenbergs argue that Kunz and Bedke receive no absolute immunity for any act associated with the grand jury phase of the prosecution because the grand jury functioned as an "investigative tool." However, a prosecutor's acts in the course of seeking an indictment from a grand jury, including conduct during grand jury proceedings, receive absolute immunity. *See Burns,* 500 U.S. at 490 n. 6, 111 S.Ct. 1934 ("There is widespread agreement among the Courts of Appeals that prosecutors are absolutely immune from liability under § 1983 for their con-

duct before grand juries."); *Malley v. Briggs,* 475 U.S. 335, 341–43, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *Strength v. Hubert,* 854 F.2d 421, 424 (11th Cir.1988) ("A prosecutor seeking an indictment is in the judicial phase of criminal proceedings."); *Yaselli v. Goff,* 12 F.2d 396, 406 (2d Cir.1926) (a prosecutor receives immunity from a claim for malicious prosecution for actions in a grand jury proceeding), *aff'd,* 275 U.S. 503, 48 S.Ct. 155, 72 L.Ed. 395 (1927); *see also Mastroianni v. Bowers,* 173 F.3d 1363, 1366 (11th Cir.1999) (any potential liability for a prosecutor must derive from acts performed before the initiation of grand jury proceedings). The complaint alleges that the Aisenbergs were the only persons identified by prosecutors as suspects for Sebrina's disappearance and further alleges that the defendants worked to "frame" the Aisenbergs. Thus, despite the Aisenbergs' characterization, the allegations demonstrate that the federal grand jury convened to return an indictment against the Aisenbergs, not merely to "investigate" Sabrina's disappearance or to search for other suspects. *See Morrison v. City of Baton Rouge,* 761 F.2d 242, 248 (5th Cir.1985) ("[T]he cases establish that presentation of evidence to a grand jury in a manner calculated to obtain an Indictment, even when maliciously, wantonly or negligently accomplished is immunized ...."); *cf. Buckley,* 509 U.S. at 263–64 & 275, 113 S.Ct. 2606 (the prosecutor received no absolute immunity for conduct associated with the grand jury where, "[u]nable to solve the case, [the prosecutor] ... convened a special ... 'investigative' grand jury, devoted solely to investigating the ... case").[18] Accordingly, Bedke and Kunz receive absolute immunity for the solicitation of knowingly false, deceptive, or inconsistent testimony

18. In *Buckley,* the grand jury heard over 100 witnesses in eight months but returned no indictment and the prosecutor publicly admit- ted that insufficient evidence existed to "indict anyone." 509 U.S. at 263–64, 113 S.Ct. 2606.

from Burton; for their refusal to excuse the Aisenbergs from appearing in the grand jury; and for all other conduct in the grand jury proceedings, including the questioning of the Aisenbergs.

Further, although alleging that Kunz and Bedke acted as "investigators", the complaint fails to identify any "investigative" act not subject to absolute immunity. According to the complaint, Kunz and Bedke "advised and helped direct" the Sabrina task force, attended task force meetings, "assisted the HCSO in the investigation," "assisted investigators in developing potential leads," "were involved" in Bullara's decision to contact HRS, discussed the HRS investigation with the HCSO and HRS, and requested HRS investigation reports. However, these alleged acts amount neither to "direct participation with ... [law enforcement] in conducting a search" nor to a search "for the clues and corroboration that give a [detective] ... probable cause to recommend that a suspect be arrested." *Buckley,* 509 U.S. at 273, 113 S.Ct. 2606; *Mullinax,* 817 F.2d at 715. In fact, the allegations in the complaint describe conduct consistent with preparation for the grand jury phase of the Aisenbergs' prosecution, that is, conduct enjoying the historic protection of absolute immunity, even if tainted by ill-will or ineptitude.

**B. Qualified Immunity**

█ Qualified immunity protects a prosecutor's discretionary acts that violate no "clearly established statutory or constitutional rights of which a reasonable person would have known." *Jones,* 174 F.3d at 1282; *see Gonzalez v. Reno,* 325 F.3d 1228, 1233 (11th Cir.2003). A "clearly established" right requires sufficient clarity that a "reasonable official would under-

stand that what he is doing violates that right." *Jones,* 174 F.3d at 1282 (quotations omitted); *Kingsland v. City of Miami,* 369 F.3d 1210, 1223 (11th Cir.2004) ("The essence of qualified immunity is the public official's objective reasonableness, regardless of his underlying intent or motivation."). In other words, qualified immunity protects a prosecutor unless the prosecutor's act "is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent [government agent] or one who was knowingly violating the law would have done such a thing." *Rowe,* 279 F.3d at 1280 (to surrender qualified immunity, "pre-existing law must dictate, that is, truly compel ... [and] not just suggest or allow or raise a question about ..., the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances* ") (quotations omitted); *see GJR Invs., Inc.,* 132 F.3d at 1366 ("Because qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity" (quotations omitted)).

The Aisenbergs must demonstrate that Kunz's and Bedke's acts receive no qualified immunity.[19] *Kingsland,* 369 F.3d at 1223. Whether Kunz and Bedke receive qualified immunity requires first resolving whether the alleged facts, assessed in the light most favorable to the Aisenbergs, demonstrate that Kunz's and Bedke's conduct violated a constitutional right. *See Gonzalez,* 325 F.3d at 1233–34 (qualified immunity requires dismissal of an action if the complaint "fails to allege the violation of a clearly established constitutional right"). If the alleged facts demonstrate Kunz and Bedke violated a constitutional

**19.** The Aisenbergs fall to challenge Kunz's and Bedke's satisfaction of the initial requirement of demonstrating conduct within the

scope of discretionary authority. *See Gonzalez,* 325 F.3d at 1234.

right, a determination of whether the constitutional right qualified as "clearly established" follows. *See Gonzalez*, 325 F.3d at 1234.

The Aisenbergs assert Fourth Amendment violations arising from material misrepresentations in an application to intercept oral communications and Fourth and Fifth Amendment violations for both fabrication of evidence and participation in a conspiracy to file criminal charges based on false or fabricated evidence. Aside from allegations of conduct found to receive absolute immunity earlier in this order, the complaint also alleges that Kunz and Bedke both consulted with other defendants before the other defendants' decision to submit the "Original [Intercept] Application" and "offered legal advice on the propriety and drafting of the Application for Interception of Certain Oral Communications." [20] Although using false statements in an application for a warrant and fabricating incriminating evidence violate the Constitution, the allegations of consulting on and providing legal advice for the intercept applications raise no constitutional violation. [21] *See Jones*, 174 F.3d at 1285 & 1289–90. The allegations superficially assert Kunz's and Bedke's involvement with the original intercept application. However, the allegations neither specifically or factually support a claim for a constitutional violation based on either fabrication of evidence or material misrepresentations nor otherwise describe participation in allegedly unconstitutional conduct. Further, any attempt to state a claim for relief based on Kunz's and Bedke's awareness of, failure to report, or failure to prevent law enforcement's misrepresentations fails because, in this instance, failure to report or prevent misconduct violates no clearly established constitutional right. *See Rowe*, 279 F.3d at 1281; *see also Jones*, 174 F.3d at 1286 ("There is no controlling authority clearly establishing that once a police officer knows another officer has fabricated a confession in a police report for a warrantless arrest, that police officer has a constitutional duty to intervene to stop the other officer's conduct. A police officer is entitled to qualified immunity when performing discretionary functions unless the officer has violated a clearly established right of which a reasonable police officer would have known."). [22]

■ Next, the Aisenbergs contend that Kunz and Bedke receive no immunity for statements to the press. Although a prosecutor's statement to the press may form an integral part of the prosecutor's occupation, the statement receives no absolute immunity because the statement involves neither the initiation of a prosecution, the presentation of the government's case in court, nor any act in preparation for the initiation of prosecution or the presentation of the government's case in court. *See Buckley*, 509 U.S. at 277–78, 113 S.Ct.

20. The complaint also alleges that Kunz and Bedke knew of the "intentional misrepresentations [in the January 9 and February 11, 1998, intercept extension applications,] and promoted these falsehoods in their effort to falsely inculpate the ... [Aisenbergs] and manufacture a criminal case against them." However, because both the "promotions" occurred either in grand jury or court proceedings and the complaint concedes that any "promotion" was intended for the criminal prosecution of the Aisenbergs, Kunz and Bedke performed these acts within their role as government advocates and receive absolute immunity.

21. Because the conduct addressed in this paragraph receives qualified immunity, no need arises to determine whether absolute immunity also applies.

22. In fact, the complaint fails to allege, other than in a conclusory fashion, either Kunz's or Bedke's awareness of any misrepresentation at the time of the original intercept application.

2606 (comments to the press "have no functional tie to the judicial process"). Nevertheless, a prosecutor's statement to the press may receive qualified immunity. *Buckley,* 509 U.S. at 278, 113 S.Ct. 2606.

The complaint alleges that in December, 1997, although investigators had already eliminated the relevance of the report, Kunz, Bedke, and other defendants notified the press of the possible involvement in Sabrina's disappearance of a white van. According to the complaint, the defendants knew that the Aisenbergs owned a white van and, consequently, knew that dissemination of the information would cast intense public suspicion on the Aisenbergs. The complaint further alleges (1) that shortly before the Aisenbergs' February 11th grand jury appearance, Kunz and Bedke leaked the scheduled date and (2) that Kunz, Bedke, and other unidentified defendants both notified the media that they were traveling to Maryland to investigate an alleged sexual harassment claim against Steven Aisenberg and revealed the alleged victim's identity. However, none of these statements raises a constitutional concern (1) because, at a minimum, the complaint fails to allege that either Kunz or Bedke knew of the elimination of the white van's relevance at the time of press notification and (2) because the Aisenbergs demonstrate neither that release of the Aisenbergs' scheduled grand jury date nor that dissemination of information about an earlier sexual harassment claim against Steven Aisenberg violated either the Fourth or Fifth Amendment.

The complaint also alleges that Kunz and Bedke attended a press conference at the Tampa office of the United States Attorney on September 9, 1999, announcing the Aisenbergs' Indictment. Although the complaint fails to allege that Kunz or Bedke spoke at the conference, the complaint states that the information revealed at the conference, specifically that the Aisen- bergs both lied to authorities and discussed Sabrina's death and a cover-up, resulted from the "lies and false statements created by ... Kunz and Bedke and included in the indictment." However, as explained earlier in this order, Kunz and Bedke receive absolute immunity for any statement in the indictment and Kunz's and Bedke's mere presence at the press conference violates no constitutional right.

■ Finally, according to the complaint, Kunz and Bedke "advised and helped direct" the Sabrina task force, attended task force meetings, "assisted the HCSO in the investigation," and "assisted investigators in developing potential leads." Although, as mentioned earlier, Kunz and Bedke receive absolute immunity for these acts, Kunz and Bedke also receive qualified immunity because none of these acts raises a constitutional violation. *See GJR Invs., Inc.,* 132 F.3d at 1367 ("If a plaintiff has not sufficiently alleged a violation of *any* constitutional right, it is axiomatic that the plaintiff likewise has failed to allege the violation of a 'clearly established' right.").

C. The Conspiracy Claim

■ Any liability of Kunz or Bedke for conspiring to violate the Aisenbergs' constitutional rights requires either an agreement to join the conspiracy or conduct outside the prosecutorial role knowingly performed in furtherance of the conspiracy. *Rowe,* 279 F.3d at 1282; *see Strength,* 854 F.2d at 425 (a prima facie case of conspiracy to violate any right protected by Section 1983 requires demonstration by the plaintiff that the defendant "reached an understanding" to violate the plaintiff's rights). If a prosecutor receives immunity for the acts upon which a conspiracy claim relies, the prosecutor remains immune from the conspiracy claim. *See Rowe,* 279 F.3d at 1282; *Jones,* 174 F.3d at 1288–89; *see, e.g., Imbler,* 424 U.S. at 416 & 430–31, 96 S.Ct. 984. In other words, consider-

ation of a prosecutor's participation in a conspiracy to violate a criminal defendant's rights may not include any evidence of an act for which the prosecutor receives immunity. *Rowe*, 279 F.3d at 1282. After eliminating from consideration the acts for which Kunz and Bedke receive immunity, the complaint fails to sufficiently allege a claim pursuant to Section 1983 for participating in a conspiracy with individuals acting under color of state law to violate the Fourth and Fifth Amendments by filing "criminal charges based on false or ... fabricated evidence." The remaining allegations sufficiently allege neither an agreement to join the conspiracy nor conduct both outside the prosecutorial role and knowingly performed in furtherance of the conspiracy. In fact, the remaining allegations fail entirely to allege any conspiracy that includes both Kunz and Bedke. *See GJR Invs., Inc.*, 132 F.3d at 1370.

## D. Conclusory Allegations

" 'Unsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal.' " *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir.2003) (quoting *Marsh v. Butler County*, 268 F.3d 1014, 1036 n. 16 (11th Cir.2001)). A valid civil rights claim, especially when defended with immunity, requires more than conclusions. *See Dalrymple*, 334 F.3d at 996–97; *Gonzalez*, 325 F.3d at 1235. The complaint contains many conclusory allegations, but, even considered *en grosse*, the conclusions of the Aisenbergs support no claim against Kunz or Bedke.[23] *See, e.g., Dalrymple*, 334 F.3d at 996–97; *Gonzalez*, 325 F.3d at 1235.

"Conclusory" means "expressing a factual inference without stating the underlying facts on which the inference is based."

**23.** The conclusory allegations of misconduct by Kunz and Bedke include that Kunz or Bedke "assisted investigators in developing potential leads in an effort to implicate the Aisenbergs in their daughter's disappearance;" knew of purportedly intentional misrepresentations in the first and second intercept extension applications and "promoted these falsehoods in their effort to falsely inculpate" the Aisenbergs; "influenced" the oral intercepts "through personal contact with the remaining Defendants and others," functioned as "investigators" and used the federal grand jury as an "investigative tool," during which time the United States had no probable cause to arrest the Aisenbergs; performed various enumerated acts "for the purpose of distorting the truth, deceiving the grand jury and recklessly and corruptly influencing the investigation to frame the Aisenbergs and deny them due process of law," including conspiring with and inducing Burton to make materially false and misleading statements to the grand jury and soliciting perjurous testimony; "leaked" the Aisenbergs' grand jury date to influence public suspicion and convince the public of the Aisenbergs' guilt; asked the Aisenbergs knowingly false and misleading questions to "corruptly prejudice" the grand jury; were involved in the decision to contact HRS to "intimidate" and "influence" the Aisenbergs; "systematically and routinely disclosed to the press erroneous and prejudicial information ... to improperly influence public opinion and prejudice the potential grand and petit jurors;" disclosed the possible relevance of a white van to cast public suspicion on the Aisenbergs; investigated and notified the media of the sexual harassment claim against Steven Aisenberg to "wrongly" portray Steven Aisenberg as a sexual offender and to "intimidate and divide" the Aisenbergs; disseminated "misleading and prejudicial information" to influence the jury pool; knew about the inaudibility of and lack of incriminating statements in the taped intercepted communications; included "reckless and corrupt" misrepresentations in the indictment; moved to disqualify Cohen and Foster and compel retention of separate counsel to "further oppress, threaten, and isolate the Aisenbergs;" fabricated evidence to "perpetuate the lies" in the intercept extension applications and the indictment; and retained Pellicano as an expert because Pellicano "was willing to fabricate evidence" and because no "reputable authority would agree to support [Kunz and Bedke's] ... endeavor to deceive" the court and the jury pool.

Black's Law Dictionary 284 (7th ed.1999). As illustrated in the examples at footnote 23, the Aisenbergs' complaint includes a long list of accusatory, evocative allegations, leveling against the prosecutors sundry charges of malevolence and malignancy. However, as stated, neither the tartness of the allegation nor its determined repetition alters its character as a conclusion and transforms conclusion into fact. Stated simply, to allege a soldier is a "traitor" and "deserter" is a more conclusion; to allege that on a specified day at a specified place a member of the armed forces lawfully committed to combat by his superior officer during a declared war willfully and unjustifiably threw down his weapon in the course of battle and fled from the enemy in defiance of a direct, simultaneous, and lawful order and accosted his fellow soldiers in an attempt to injure or kill them and to materially assist the enemy—that alleges treason and desertion, a claim to which the word "traitor" or "deserter" is unnecessary. The Aisenbergs' complaint alleges conclusions, not facts.

The complaint's allegations against Kunz and Bedke of both material misrepresentations in the intercept applications and conspiracy with individuals acting under color of state law to file criminal charges based on fabricated evidence are conclusory and support no pertinent claim. Accordingly, even assuming that Kunz and Bedke receive no immunity for their conduct in the Aisenbergs' criminal matter, the complaint's insufficiency requires dismissal, at a minimum, of the claims (1) pursuant to *Bivens* for violation of the Fourth Amendment right of freedom from unreasonable search and seizure for material misrepresentations in an application to intercept the Aisenbergs' oral communications and (2) pursuant to Section 1983 for alleged participation in a conspiracy with individuals acting under color of state law to violate the Fourth and Fifth Amendment by filing "criminal charges based on false or . . . fabricated evidence."

## III. ANTHONY PELLICANO'S MOTION TO DISMISS

The United States retained Pellicano as an audio "expert" after initiation of the criminal prosecution. The complaint alleges that Pellicano "corruptly transcribed several conversations in anticipation of hearings before the court in that he corroborated Defendants' false versions of the contents of the intercepted conversations." The rest of the allegations about Pellicano are wholly conclusory.[24]

Pellicano moves to dismiss and contends entitlement to absolute immunity from liability for any claim arising from his participation in the prosecution of the Aisenbergs (Doc. 114). The Aisenbergs respond that the claims against Pellicano arise not from any false testimony but from Pellicano's fabrication of false transcripts of purportedly intercepted communications, which fabrication, the Aisenbergs contend, qualifies as conduct outside the judicial process which receives no immunity (Doc. 115).

 According to the complaint, the United States retained Pellicano after initi-

---

**24.** The conclusory allegations include that the United States retained Pellicano "to fabricate transcripts of [intercepted communications], legitimize prior misrepresentations and suborn perjury;" to "assist [Kunz and Bedke] in furthering their false claim that the Inaudible tapes obtained through the oral interception were in fact audible;" and to "support [Kunz and Bedke's] . . . version of the conversations and the accuracy of their transcripts." Further, Pellicano "was willing to fabricate evidence that . . . Kunz, Bedke and Pellicano reasonably believed would be introduced at hearings and the trial of the Aisenbergs" and "no other reputable authority would agree to support [Kunz and Bedke's] endeavor to deceive the district court and a potential jury pool."

ation of the prosecution. Further, Pellicano drafted no transcript: the HCSO officers drafted the transcripts submitted with the intercept extension applications and Kunz, Bedke, and other government agents drafted the transcripts submitted in federal court. Consequently, the Aisenbergs base their claims against Pellicano solely on Pellicano's "[corroboration of the] Defendants' false versions of the contents of the intercepted conversations" after initiation of the prosecution. Although the complaint describes no example of corroboration (or any other pertinent act) by Pellicano, any actionable corroboration necessarily occurred as part of the prosecution of the Aisenbergs, through either testimony or a written submission to the court, and, consequently, receives absolute immunity.[25] *See Briscoe v. LaHue,* 460 U.S. 325, 335 & 345–46, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983) (a witness, like a judge and a prosecutor, receives absolute immunity for his participation in a judicial proceeding); *cf. Keko v. Hingle,* 318 F.3d 639 (5th Cir.2003) (an expert witness receives absolute immunity neither for investigating and preparing nor for authoring a report submitted at an *ex parte* probable cause hearing to obtain an arrest warrant). Immunity also protects Pellicano from the Aisenbergs' state law claim for intentional infliction of severe emotional distress. *Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A. v. United States Fire Ins. Co.,* 639 So.2d 606, 608 (Fla.1994) (absolute immunity extends to a witness'

act that occurs "during the course of a judicial proceeding ... so long as the act has some relation to the proceeding").

Alternatively, the complaint fails to sufficiently state a claim against Pellicano. The single non-wholly conclusory allegation against Pellicano remains vague and supports neither a claim for fabrication of evidence nor a claim for intentional infliction of severe emotional distress. Further, the allegation fails to demonstrate that Pellicano "reached an understanding" to violate the Aisenbergs' rights and, consequently, establishes no prima facie case for conspiracy to violate the Aisenbergs' constitutional rights. *See Strength,* 854 F.2d at 425.

## IV. THE UNITED STATES' MOTION TO DISMISS

The United States moves to dismiss the Aisenbergs' state law claim for intentional infliction of severe emotional distress (Doc. 7). Because the record contains neither an allegation nor any evidence that the Aisenbergs presented the claim (or any other state law claim) to the United States Department of Justice before the claim's assertion in this action, the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.,* requires dismissal of the claim for intentional infliction of severe emotional distress. *See* 28 U.S.C. § 2675(a).

## V. THE REMAINING PARTIES

The remaining defendants move to remand the action (Docs. 61, 62, & 105).

---

25. Apparently, the only example in the record of specific conduct by Pellicano appears in Magistrate Judge Pizzo's February 14, 2001, report and recommendation for suppression of the recordings of intercepted communications in the Aisenbergs' criminal case. The report and recommendation describes testimony by Pellicano in opposition to the Aisenbergs' motion to suppress the intercepted communications (Doc. 15, Ex. 21), for which testimony Pellicano receives absolute immu-

nity. *See Collins v. Walden,* 613 F.Supp. 1306, 1314 (N.D.Ga.1985), *aff'd,* 784 F.2d 402 (11th Cir.1986) (a witness' testimony in a pretrial hearing receives absolute immunity); *Hughes v. Long,* 1999 WL 1000443 at *4 (E.D.Pa. Oct.21, 1999) ("Witnesses are afforded immunity for testimony given at all stages of judicial proceedings ... because the 'interest in complete disclosure is no less diminished at the pre-trial stage.' ").

Because this order dismisses the claims against the removing parties, the remaining defendants may continue defending the action in the original state forum.[26]

## VI. CONCLUSION

In sum, the motions to dismiss of Kunz and Bedke, the United States, and Pellicano (Docs. 5, 7, & 114) are **GRANTED** and the claims against (1) Kunz and Bedke, (2) the United States by substitution for Kunz and Bedke in count ten of the complaint, and (3) Pellicano are **DISMISSED.** The Aisenbergs' motion for a conditional certification pursuant to *Chuman v. Wright,* 960 F.2d 104 (9th Cir.1992) (Doc. 84), is **DENIED AS MOOT.** Finally, the remaining defendants' motions to remand (Docs. 61, 62, & 105) are **GRANTED** and this action is **REMANDED** to state court. The Clerk is directed to (1) mail a certified copy of this order to the Clerk of the Civil Division of the Florida Circuit Court of the Thirteenth Judicial District for Hillsborough County pursuant to 28 U.S.C. § 1447(c); (2) terminate any pending motion; and (3) close the file.

26. Because of remand, this order need not resolve the remaining defendants' motions to dismiss and motions to strike (Docs. 34 & 39).